Ester V. PAFFORD and Thomas A. Krudy, Trustee in Bankruptcy for the Estate of Ester V. Pafford, Plaintiffs–Appellants,

v.

Alexis M. HERMAN, Secretary of Labor,[1] Defendant–Appellee.

No. 96–4241.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1997.

Decided June 2, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied July 29, 1998.

1. The current Secretary of Labor, Alexis M. Herman, is substituted for Robert Reich as the named defendant. Fed. R.App. P. 43(c).

Richard L. Darst (argued), Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, IN, for Plaintiffs–Appellants.

Tim A. Baker (argued), Office of the United States Attorney, Indianapolis, IN, for Defendant–Appellee.

Before POSNER, Chief Judge, and COFFEY and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Ester V. Pafford, formerly a Wage and Hour Compliance Specialist ("Wage–Hour Investigator") in the Wage and Hour Division of the Indianapolis District Office of the United States Department of Labor, filed suit against the Department of Labor under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, claiming denial of training and promotion from a GS–9 to a GS–11 [2] based on her race (Filipino) and national origin (Philippines), and retaliation. Pafford also sought review of the Merit Systems Protection Board's decision affirming her termination. The district court granted summary judgment in favor of the Department of Labor and Pafford appeals. We affirm.

## I. BACKGROUND

The Wage and Hour Division of the Department of Labor (the "DOL") enforces employer compliance with federal laws governing employee wage rates, working hours, and fringe benefits. An employer often comes under the scrutiny of the DOL in response to an employee's complaint, which is investigated by a Wage–Hour Investigator. Cases involving "common types of clear-cut violations" of federal labor laws are assigned to GS–9 investigators, whereas "cases involving substantial difficulty, requiring resourcefulness in establishing facts and a need for judgment in interpreting and applying the laws" are assigned to GS–11 investigators.

In June 1987 Pafford, a Filipino female, was hired as a GS–7 Wage–Hour Investigator in the Wage and Hour Division of the Indianapolis District Office of the DOL. Connie Klipsch (Caucasian), the Assistant District Director and Pafford's direct supervisor, promoted Pafford from a GS–7 to a GS–9 in September 1988. Although Klipsch began supervising Pafford when she was hired in 1987, Pafford alleges that it was not until Klipsch was promoted to District Director in 1989 that the discrimination began.

### Pafford's Performance

As a GS–9 investigator, Pafford was expected to "independently complete" cases assigned to her, which involved developing the necessary information by interviewing employers and employees, analyzing the pertinent business records, and determining the wage and hour laws applicable to the facts of the case; computing back pay owed by the employer to his or her employees; and negotiating directly with the employer's representative to recover back pay and ensure future compliance.

Pafford consistently received within-grade pay increases and annual performance reviews rating her performance as satisfactory on a scale of "outstanding," "highly effective," "satisfactory," "minimally satisfactory," and "unacceptable." However, she was advised of various performance deficiencies along the way. For example, in March 1989 Klipsch rated Pafford's performance as satisfactory, but according to Klipsch's memorandum to the file, Klipsch informed Pafford that she was spending too much time resolving individual cases. Klipsch advised Pafford that although she would be eligible for promotion to GS–11 in the Fall based on her length of service as a GS–9, Klipsch did not believe Pafford would be ready for the promotion. According to the memorandum, Pafford agreed and requested more time to improve her performance before being considered for promotion. As anticipated, Klipsch did not recommend Pafford's promotion in the Fall of 1989 allegedly because Pafford was still experiencing difficulty

---

2. The term "GS" is the abbreviation for "General Schedule" and indicates the level of pay for salaried government employees. 5 U.S.C. § 5332.

working independently, frequently requesting assistance from her colleagues and Klipsch.

In June 1989 Klipsch was promoted to District Director of the Indianapolis District Office, and Raymond Wyzguski was assigned to the office as Assistant District Director. In this position, Wyzguski supervised Pafford from August 1989 until February 1991, during which time he also declined to recommend Pafford for promotion to GS–11. He attested that although Pafford received satisfactory performance ratings, "her performance was at the low end of successful, and in some cases, below that level." According to Wyzguski, Pafford was having difficulty performing at the GS-9 level; he claims to have trained and retrained her in Fair Labor Standards Act ("FLSA") policies, interpretations, and investigation procedures, and maintains that he did not assign Pafford to more complex cases involving other laws because she had not mastered the FLSA.

### Suspension and Leave Restriction

Pafford received another new supervisor in February 1991 when Jane Hooton was promoted to Assistant District Director, replacing Wyzguski. Wyzguski had been designated as the Temporary District Director in November 1990 because Klipsch had become the Quality Advisor, and from January 1, 1991 until December 2, 1991, she worked out of an office on the south side of Indianapolis.

Pafford took a leave of absence from April through early July 1991. Shortly after her return, she received notice of her proposed suspension and was placed on a leave restriction. On July 18, Hooton gave Pafford notice of her proposed suspension (1) for attempting to sell Amway products to the employees of a company she was investigating, (2) for failing to obtain approval for outside employment, and (3) for breaching the DOL's policy of confidentiality by not keeping files within her exclusive control (she left files at her

mother-in-law's house) and by allowing a complainant to listen to Pafford's telephone conversation with the complainant's employer. In October 1991, after considering Pafford's response to her proposed suspension, Wyzguski suspended Pafford for fifteen days for the reasons set forth above.

In addition to the suspension, Hooton placed Pafford on a six-month leave restriction due to her "extensive leave usage and unplanned absences" between June 1990 and July 1991. In the course of a single year, Pafford had used 266 hours of annual leave, 98 hours of sick leave, and 255 hours of leave without pay—the majority of which was unscheduled—for a total of 77 days. Pafford worked a full 80-hour pay period only nine times (out of a possible 26) in 1990, and only five times in 1991. Hooton admonished Pafford that she would be charged as absent without leave for failure to comply with the conditions of the leave restriction[3] and that excessive absences without leave could subject her to disciplinary action up to and including termination.

Approximately two weeks after receiving the leave restriction, Pafford filed an informal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was followed by a formal charge about two weeks later. In her formal charge, she alleged that four Caucasian employees hired after her were "developed and upgraded to GS–11," an opportunity she claimed to have been denied because of her race, color, national origin, and age (fifty-five).

### Weapons Screening

Around the time of Pafford's suspension in the Fall of 1991, Hooton told Wyzguski that she was concerned about her safety because of Pafford's behavior. Wyzguski thereafter

---

**3.** Pursuant to the leave restriction, Hooton required Pafford to schedule all future leave in advance and provided that any additional unscheduled absences would not be approved other than for an emergency, which would be determined by Hooton. Hooton further advised Pafford that due to the deleterious effect of Pafford's

absences on the office, advance leave would no longer be granted and leave without pay would no longer be approved. For any absences due to illness or medical appointments, Hooton required Pafford to submit a medical certificate meeting certain requirements, which were listed.

decided that Pafford should be screened for weapons upon her entry into the federal courthouse where the DOL was located. Although everyone who entered the courthouse was required to pass through the metal detector, employees normally were not stopped even if the alarm sounded. After the weapons screening was instituted, if the metal detector alarm sounded when Pafford walked through, the officers would wave a hand-held metal detector over her body.

Wyzguski submitted a declaration in which he stated that his decision to screen Pafford for weapons was based on the following: his previous referral of Pafford to the Employee Assistance Program for counseling due to her "apparent emotional difficulties"; Pafford coming into his office several times crying about the fact that her son and husband were serving in the Gulf War and her fear that her husband was having an affair; her statement that she had contemplated suicide; the rumor that Pafford owned a gun and carried it with her or on her person; recent news accounts of workplace violence; and Pafford's performance problems, current suspension, and leave restriction. Wyzguski revoked the screening order after about one week.

Wyzguski subsequently spoke with Klipsch, who at the time was still working outside the Indianapolis office but was expected to return to the office shortly as District Director. Wyzguski told Klipsch that he had requested the Marshals Service to screen Pafford for weapons, but that he had halted that screening. At Klipsch's request, Wyzguski provided Klipsch with all the information he had relied upon when he ordered the screening. Klipsch stated that after receiving all the information and considering the safety of the employees at the Indianapolis office, she telephoned Dick McMahon, the Deputy Regional Administrator in Chicago, and discussed her concerns with him. Shortly thereafter, McMahon telephoned Wyzguski and ordered the screening reinstated. On November 27, 1991, Wyzguski asked the Marshals Service to resume screening Pafford.

## Performance Improvement Plan

Upon Klipsch's return to the Indianapolis office in early December 1991, she met with Hooton and Wyzguski on a number of issues, including Pafford's performance. Hooton stated that Pafford was continuing to experience problems applying the law. To improve Pafford's performance, Klipsch directed that Pafford complete a training package used for new investigators and re-take an earlier training package on the 1989 amendments to the wage and hour laws.

On January 30, 1992, Hooton extended Pafford's leave restriction for another six months due to her continued absences. Following the imposition of the July 30, 1991 leave restriction, Pafford was absent without leave seven times for a total of 51.5 hours.

On May 28, 1992, Ken Morrison, who replaced Hooton as Pafford's supervisor, placed Pafford on a Performance Improvement Plan ("PIP"). The PIP identifies the primary deficiencies in Pafford's performance as the quality of her performance and effective case hour management. To achieve a satisfactory rating in the quality of performance category, 80–92% of Pafford's case investigations had to be acceptable upon their first submission to her supervisor. However, six of the last eight investigations submitted by Pafford proved to be unacceptable. With respect to effective case hour management, 92–97% of the investigations had to be completed in a manner that supports the amount of time expended. Three of Pafford's last eight investigations were unacceptable in this category. Pafford was given ninety days to improve her performance, and was advised that her failure to do so could result in reassignment, reduction in grade, or termination.

On July 9, 1992, Pafford was absent from work and her husband delivered to Morrison a request for 520 hours of sick leave. Pafford submitted medical documentation in support of this request, including a letter dated June 26, 1992, from Dr. John Steenbergen stating that he had advised Pafford to take a leave of absence to reduce her stress level, and a certificate dated July 7, 1992, from Dr. S. Schmidt–Burke stating that Pafford could return to work when released by

Dr. Steenbergen.[4] According to Morrison, the medical certificates submitted failed to comply with the requirements set forth in Pafford's leave restriction. The restriction required Pafford to support all leave due to illness with a medical certificate from a licensed physician stating the period of time Pafford was under the physician's care, her diagnosis, her prognosis for a full recovery, the expected time for recovery, any special precautions that should be taken upon her return to work, and whether her illness was chronic or recurring.

Morrison denied Pafford's request for a three-month leave of absence because she had used all of her sick leave and, under the terms of her leave restriction, she could not be granted advanced leave or leave without pay. Morrison advised Pafford that she would be charged as absent without leave ("AWOL") until she returned to work. Notwithstanding this warning, she did not return. At the end of July, Morrison extended Pafford's leave restriction for another six months due to her continued unscheduled absences—108 hours of AWOL since the leave restriction was extended in January 1992—and reminded her that further absences could lead to disciplinary action including termination.

### Denial of Transfer and Termination

On September 2, 1992, Morrison sent Pafford notice of her proposed removal based on her AWOL status and her failure to follow instructions. The latter charge concerned Pafford's failure to adhere to Morrison's prohibition on her working at home, her failure to comply with the medical documentation requirements imposed by the leave restriction, and her failure to provide case files to Morrison upon his request.

Notwithstanding the notice of proposed removal, on September 27, 1992, Pafford requested an additional 512 hours of sick leave. In support of this request, she submitted a letter dated September 3 from Dr. Steenbergen, stating that Pafford should take another three months of leave from her job to reduce

her stress level. The record does not reflect that Morrison responded to this request in writing. However, on October 28, 1992, Klipsch approved Pafford's termination effective November 6, 1992. Pafford appealed her removal to the Merit Systems Protection Board ("MSPB"), and her termination was affirmed.

Meanwhile, on October 2, after Pafford received notice of her proposed removal and while still absent without leave, Pafford sent Klipsch a memorandum requesting a transfer to one of the DOL offices in Tennessee. Klipsch replied that her authority regarding personnel matters was confined to the Indianapolis District Office, and advised Pafford to contact the DOL's Regional Personnel Office in Atlanta, Georgia. Pafford thereafter filed an application with Alfred Perry, the DOL Deputy Regional Administrator in Atlanta, requesting a transfer effective November 2, 1992, four days before her removal would become effective. On October 30, Perry denied Pafford's request for transfer, stating that the region currently exceeded its allocated staffing level.

Despite Perry's statement that there were no openings in the Atlanta region, Pafford sent Klipsch another request for transfer, asserting that Perry had advised her to obtain the transfer through her direct supervisor. By letter dated November 5, 1992, Klipsch again explained that she did not have the authority to grant Pafford's request for transfer. Klipsch also expressed doubt about whether Pafford made the request in good faith, given that Perry's memorandum indicated that there were no openings in his region, that Pafford had been absent without leave for almost four months, and that her termination of employment was scheduled for November 6, 1992.

Pafford filed a charge of discrimination with the EEOC in September 1991 and received her right-to-sue letter in August 1992. Pafford's counsel filed suit on August 28, 1992, a few days before Pafford received notice of her proposed removal. The com-

---

4. Dr. Steenbergen was Pafford's regular physician; in his absence from the office, Pafford was referred to Dr. Schmidt–Burke.

plaint, which was amended three times, alleged discrimination on the basis of Pafford's race and national origin, and retaliation. The district court granted summary judgment in favor of the DOL on all of Pafford's claims. Pafford appeals.

Pafford contends on appeal that the district court failed to view the evidence in the light most favorable to her. Although the record is replete with attestations that Pafford was denied training and promotion opportunities and otherwise subjected to more exacting standards than non-minority employees, Pafford fails to link this alleged disparate treatment to her race, national origin, or retaliation. She offers no specific evidence demonstrating that she was similarly situated to the non-minority employees who allegedly received better treatment, or that the DOL retaliated against her for complaining of discrimination. We agree with the district court that the record fails to support Pafford's claims.

## II. ANALYSIS

### A. Summary Judgment Standard

■ We review the district court's award of summary judgment de novo, viewing all facts and inferences in the light most favorable to the non-moving party.[5] *See Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir.1997); *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1308 (7th Cir.1997). Summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

### B. Methods of Proof

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because

of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), or for an employer "to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

■ A plaintiff trying to defeat an employer's motion for summary judgment has two methods of proof at his or her disposal. Under the "direct" method, the plaintiff may show (either through direct or circumstantial evidence) that the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race or national origin. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Under the "indirect" burden-shifting method, the plaintiff may raise an inference of discrimination by offering sufficient evidence to establish a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff demonstrates a prima facie case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer carries this burden, then the burden shifts back to the plaintiff to produce "evidence that would, if believed by a trier of fact, show that the true reason for the employment action was discriminatory." *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169 (7th Cir.1998) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Pilditch v. Board of Educ.*, 3 F.3d 1113, 1116 (7th Cir.1993)).

■ Pafford's brief does not identify the method of proof she intends to employ. However, when asked at oral argument, Pafford's counsel stated that the *McDonnell Douglas* framework applied to this case.

---

5. Pafford challenges the district court's usage of the phrase "even if such allegations were true" as an incorrect statement of the legal standard on a motion for summary judgment. We agree, but any error in this misstatement was harmless.

Notwithstanding this concession, we note that the majority of Pafford's evidence of discrimination concerns hostility towards Pafford and other minority employees. Such evidence is circumstantial evidence of intentional discrimination, "the kind that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe*, 20 F.3d at 737. Although circumstantial evidence could raise an inference of discrimination, *id.* at 736, it is not sufficient to do so in this case.

Pafford's circumstantial evidence of discrimination against minority employees consists of the following: after Klipsch became the District Director, no minority employees were hired and none were promoted, and all of the minority employees-Pafford (Filipino), Aquila Crawford (African American), and Mandujano Garcia (Hispanic)—were terminated or resigned; Klipsch told someone in the office that the reason she lived on the south side of Indianapolis was to be "away from the black people"; at a retirement party Klipsch served cake in a friendly manner to Caucasian guests, but "threw the cake down on the table with an unfriendly look on her face" when she served Pafford and other minority guests; at an office picnic hosted by Charles McCormick (Caucasian), Klipsch and her family would not eat the tortillas brought by Garcia and when Garcia asked Klipsch why, she allegedly said "in a low, serious voice ... that she did not trust him"; and Hooton wrote a memorandum to Pafford's personnel file regarding alleged complaints from an employer investigated by Pafford, but the alleged complaints were later contradicted by affidavits from the employer and Pafford.

Even if a trier of fact believed all of this evidence, it would not be sufficient to establish discrimination on the basis of Pafford's race and national origin. While some of the foregoing evidence suggests discriminatory animus, it still fails to meet the standard required to defeat the DOL's motion for summary judgment. Thus, the *McDonnell Douglas* test is indeed the appropriate method of proof in this case.

■ Pafford's circumstantial evidence was not presented in vain, however, for it can be used at the pretext stage of the *McDonnell Douglas* test to demonstrate the ultimate fact of discrimination. *See Perdomo v. Browner*, 67 F.3d 140, 146 (7th Cir.1995). Bearing this in mind, our task is to determine whether Pafford has come forward with sufficient evidence from which a trier of fact could reasonably infer that the DOL denied her training or promotion on the basis of her race or national origin, or subjected her to retaliation for filing a charge of discrimination and later a lawsuit based on that charge.

### C. Pafford's Claims

■ On appeal, Pafford's various factual arguments involve one legal principle—that in resolving a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-movant.[6] Pafford contends that the district court not only failed to apply this standard, but also ignored her evidence of discrimination. In large part, this argument is aimed at the

---

**6.** Pafford also suggests a pattern and practice of discrimination through her references to the discriminatory treatment of minority employees by the "all white management." She points to the fact that after Klipsch became the District Director, all of the minority employees were either terminated or resigned. However, Pafford's allusions to disparate treatment and a pattern of discrimination did not give the DOL sufficient notice of these claims for purposes of Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 775 (7th Cir.1994) ("The primary purpose of [Rule 8's] provisions is rooted in fair notice: Under Rule 8, a complaint must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is.") (internal quotation marks and citations omitted). That Pafford's pleadings may have supported such claims had they been raised is not enough to preserve them on appeal because "the purpose of summary judgment is to refine the case sufficiently so that both parties know the precise injuries alleged and the evidence that would be used to prove them." *Sattar*, at 1168. Therefore, we confine our review to Pafford's retaliation and denial of training and promotion claims.

district court's failure to discuss her circumstantial evidence of disparate treatment. As previously noted, this evidence alone falls short of establishing a prima facie case of discrimination, but could be used to demonstrate pretext under the *McDonnell Douglas* test. For reasons explained below, we agree with the district court that Pafford has failed to come forward with sufficient comparative evidence to demonstrate a prima facie case of discrimination. The district court thus did not need to reach the pretext issue or Pafford's circumstantial evidence. *See Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179–80 (7th Cir.1997). We now turn to Pafford's remaining arguments.

### 1. Failure to Train

Pafford contends that the DOL's refusal to provide her with the necessary training rendered her unable to develop the skills necessary for promotion from a GS–9 to a GS–11. In resolving Pafford's failure to train claim, the district court determined that Pafford must establish the following prima facie elements: (1) that she was a member of a protected class; (2) that she was similarly situated to persons outside her protected class; (3) that she was treated differently than those persons; and (4) that any training the DOL failed to provide her was material to further promotion. (D.Ct.Order, 18–19). On appeal, Pafford challenges the district court's conclusion that the training she sought was immaterial to her promotion to the GS–11 position.

■ Before analyzing the merits of this claim, initially we must determine whether the materiality of the training to promotion is a proper prima facie element. Although we do not apply the *McDonnell Douglas* test rigidly, the elements of a prima facie case serve the purpose of raising an inference of discrimination. Whether the training is ma-

terial to Pafford's further promotion is irrelevant to whether the DOL denied Pafford training for a discriminatory reason. Therefore, the district court erred in requiring Pafford to produce such evidence.

■ Considering the facts of this case, to make out a prima facie case of discriminatory failure to train Pafford must demonstrate: (1) that she is a member of a protected group; (2) that the DOL provided training to its employees; (3) that she was eligible for training; and (4) that she was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, that she was denied training given to other similarly situated employees who were not members of the protected group. *See Patel v. Allstate Ins. Co.*, 105 F.3d 365, 371 (7th Cir.1997);[7] *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 161 (2d Cir.1991). The latter two requirements are at issue in this case.

■ The DOL's policy regarding training for career ladder promotion provides: "Supervisors are to assign each employee in a career ladder position developmental work or projects of sufficient complexity and responsibility to allow the employee to demonstrate that he/she is capable of performing satisfactorily at the next higher level in the career ladder." Klipsch and Wyzguski maintain that Pafford was not eligible for training as a GS–11 investigator because she had not mastered her present position as a GS–9 investigator.

Pafford argues that she was qualified to receive training for the GS–11 position because she was performing at that level. However, the only evidence she presented that she was performing at the GS–11 level consists of two compliments she received, one from former District Director Johnson Beaven in 1988 and one from Wyzguski in 1990,

---

7. In *Patel*, this court briefly addressed the failure to train claim. The parties agreed that to establish a prima facie case, the plaintiff would have to establish, "among other things, that the training she sought was not provided under circumstances giving rise to an inference of discrimination." *Patel*, 105 F.3d at 371 & n. 5. The court then cited *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157 (2d Cir.1991). In *Lopez*, the Second

Circuit held that to establish a prima facie case of discriminatory denial of training, the plaintiff must demonstrate: (1) that she is a member of a protected group; (2) that she satisfactorily performed the duties required by her position; (3) that the employer had a policy of providing on-the-job training; and (4) that she was not provided training under circumstances giving rise to an inference of discrimination. *Id.* at 161.

that she was "doing GS–11 work."[8] The district court treated these two compliments as hearsay and, alternatively, found that they were insufficient to rebut the overwhelming evidence of Pafford's performance deficiencies and absenteeism, which demonstrates that she was not eligible to be trained for the GS–11 position. One of the compliments related only to the amount of back wages recovered by Pafford and not to the other aspects of GS–11 work, and both of the compliments preceded the onset of Pafford's more serious performance problems and excessive absenteeism.

Pafford attempts to demonstrate a prima facie case by piecing together allegations that white employees received more training than she did. However, the mere fact that Caucasian employees may have received more training than Pafford falls short of raising an inference of discrimination. Pafford must come forward with specific evidence showing that she was similarly situated to Caucasian employees who received more training. This she has failed to do.[9]

Based on Pafford's charge of discrimination, her denial of training and promotion claims concern four Caucasian employees, who were hired at the GS–7 level after Pafford and promoted to the GS–11 level while Pafford remained at the GS–9 level. Pafford contends that these Caucasian employees were developed to reach the GS–11 level but

she was not.[10] However, Pafford's daily activity reports, referred to as WH–40's, reveal that she attended Basic Training I and II, a two-day Federal Women's Training Seminar, one week of Total Quality Management Training, four days of training on the 1989 Fair Labor Standards Act amendments. She also reviewed related cases for training purposes and read the Code of Federal Regulations and Field Operations Handbook. During the first year following her attendance of Basic Training I, Pafford logged more hours of training than three of the four Caucasian employees. Pafford listed 544 hours of training on her WH–40's, whereas the Caucasian employees (Edie McCullough, Jill Cousert, Judy Glazier, and Peter Engelke) trained for 579 hours, 294 hours, 423 hours, and 509 hours, respectively. Thus, there is no evidence that Pafford was denied sufficient training for her position as a GS–9 investigator. With respect to the training for promotion from the GS–9 to the GS–11 level, Pafford offers no specific evidence about the training these Caucasian employees received. She thus has failed to demonstrate that she was denied the training that they received.

Pafford offers one instance of a Caucasian GS–9 investigator who allegedly had not mastered his present position before receiving advanced training. Charles McCormick was sent to a seminar that he described as

---

8. Beaven's statement was in reference to Pafford's first significant case in which she convinced the employer to pay $13,145 in back wages. At the time, Pafford was only a GS–7 compliance officer, but the amount of back wages she recovered from the used car dealership was within the authority of a GS–11 officer. In 1990 Pafford recovered over $35,000 in back wages from another employer, and Wyzguski allegedly told Pafford that she was doing GS–11 work.

9. The only specific evidence of training received by a Caucasian employee is Charles McCormick's affidavit testimony that he was trained by almost all of the senior investigators, allowed to attend a seminar on the Migrant and Seasonal Agricultural Worker Protection Act—which he claimed prepared him for GS–12 cases—and trained in a whistle blower case. Pafford does not, however, demonstrate that she is similarly situated to McCormick.

10. In her affidavit, Klipsch admits that the training Pafford received varied somewhat from the training these Caucasian employees received. Most of Pafford's training was one-on-one instruction from Klipsch because when Pafford was hired, she was the only person at that level of training. The four investigators hired in late 1988 received more group instruction because Klipsch did not have the time to give each of them individualized instruction. Several senior investigators were stationed in the Indianapolis office at the time Pafford was hired, which allowed her to accompany experienced investigators without traveling to a field office. Nevertheless, Pafford did have the opportunity to work with at least one field investigator in the fall of 1988. By the time the four investigators hired in 1988 arrived, four of the senior investigators had either been transferred or promoted to the national office. Thus, there were fewer opportunities to observe senior investigators in the Indianapolis office and the new investigators had to be sent to the field offices to obtain experience.

involving GS–12 work. Aside from the absence of any proof that the seminar was only for GS–12 investigators, Pafford failed to offer any evidence demonstrating that she was similarly situated to McCormick and, thus, has failed to establish a prima facie case. Pafford's conclusory statements that she was not trained are not sufficient to defeat the DOL's motion for summary judgment.

## 2. Failure to Promote

The district court also found that Pafford did not present sufficient evidence to sustain her failure to promote claim. Pafford contends that the district court erred in reaching this conclusion without considering the evidence that she was denied training on the basis of her race and national origin. We disagree.

■ A failure to train claim is distinct from a failure to promote claim. One of the prima facie elements of a failure to promote claim is that the plaintiff demonstrate that she was qualified for the promotion position. If the plaintiff was not qualified for any reason, then she falls short of establishing a prima facie case and there is no inference of discrimination. *See Coco*, 128 F.3d at 1179 (where the plaintiff claimed that the employer's stated expectations were not bona fide, this court held that the plaintiff relying totally on the *McDonnell Douglas* formula "is out of luck if he can't show that he was meeting his employer's legitimate expectations"). To conclude otherwise would undermine the purpose of the *McDonnell Douglas* formula. If Pafford failed to establish that she was qualified for promotion, then all that would remain of the prima facie case would be her membership in a protected group and the promotion of Caucasian employees; under these circumstances, the inference that Pafford would have been promoted but for her race or national origin is too weak to allow the factfinder "to speculate on the motive for the [denial of promotion]." *Id.* Thus, the district court action was proper in not conflating Pafford's claims by considering evidence of the failure to train in determining whether Pafford had established her failure to promote claim.

■ To demonstrate a prima facie case for a failure to promote claim, the plaintiff must show that: (1) she is a member of a protected group; (2) she applied for and was qualified for the position; (3) she was rejected for the position; and (4) those who were promoted had similar or lesser qualifications for the position, or other evidence from which one can infer that the plaintiff was denied promotion for a discriminatory reason. *See Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir.) (based on the Supreme Court's opinion in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311–12, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), this court has "disavowed prior cases from this circuit suggesting that a Title VII plaintiff must show that she was replaced by someone of a different race, sex, and so on"), *cert. denied*, —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997).

■ Requirements for career ladder promotion in the DOL are set forth in several policy memoranda. To be eligible for promotion, an employee in a career ladder must, in the judgment of the supervisor, satisfy the following criteria:

(1) Meet all the performance requirements for the duties and responsibilities of the current position and also carry out specific assignments or projects typical of the next higher grade position in the career ladder;

(2) [Have] [r]egularly demonstrated through assigned work, performance in the current position which clearly indicates the probability of satisfactory performance in the next higher level career ladder position;

(3) Have performed in the position for a sufficient length of time to allow adequate observation of the work performed.

Klipsch attested that if a GS–9 investigator's submitted cases were accurate with respect to the computation of back wages and application of the law, then she would begin to consider the investigator for promotion to the GS–11 level. But "[i]f at any point in this progression, the [investigator] was not making progress toward independently completing investigations accurately and in an efficient manner and becoming proficient at resolving compliance and back wages issues,

**670**

[Klipsch] would not continue to give them more difficult cases and would not move them into a more independent mode."

Pafford attempts to demonstrate that she was qualified for promotion by arguing that her performance was always rated as satisfactory, and the DOL has failed to produce a document that indicates otherwise. Although Pafford may have received satisfactory ratings for purposes of within-grade step increases from 1988 through 1991, these ratings do not negate the ample evidence to the contrary, such as her chronic absenteeism, her suspension, the leave restrictions, and the performance improvement plan.

Pafford has failed to come forward with sufficient evidence of her qualifications for promotion, and has likewise failed to establish that she was as qualified or more qualified than the four Caucasian employees who were promoted. Any inference of discrimination that could be drawn from the promotion of four Caucasian employees is negated by the fact that four other Caucasian employees (Carol Atkinson, Linda Stalion, Charles McCormick, David Filbey) hired during the same period as Pafford were not promoted to the GS–11 level.[11] Pafford has thus failed to demonstrate a prima facie case of discriminatory denial of promotion.

### 3. Retaliation

Although Pafford did not claim retaliation in her charge of discrimination, she alleges retaliation in her third amended complaint (and in each preceding complaint). There is no evidence that Pafford exhausted her administrative remedies with respect to this claim, but for reasons unexplained in this record the DOL did not raise the issue of waiver in the district court or on appeal.

This affirmative defense is thus waived, and we consider the merits of Pafford's retaliation claim.

It was unclear from Pafford's pleadings and submissions which actions she claimed to be retaliatory. The district court determined that Pafford's retaliation claims related to the weapons screening, her termination, and her denial of transfer. Pafford does not challenge that characterization of her claims.

The *McDonnell Douglas* burden-shifting formula applies to retaliation claims just as it applies to discrimination claims. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1146 (7th Cir.1997). To establish a prima facie case of retaliation, Pafford must show that (1) she engaged in statutorily protected expression, *i.e.*, reporting or otherwise opposing conduct prohibited by Title VII, (2) she suffered an adverse employment action, and (3) there is a causal link between her protected expression and the adverse employment action. *Id.* If shown, the employer must offer a legitimate, nondiscriminatory reason for its actions. The burden then shifts back to the plaintiff to demonstrate that the employer's proffered explanation is merely a pretext for retaliation.

#### a. Weapons Screening

Pafford contends that the district court applied the wrong legal standard in analyzing the unlawfulness of the "searches" to which she was subjected upon entry into the federal courthouse where she worked. The standard that Pafford urges us to apply is the standard for determining whether a search was reasonable under the Fourth Amendment. Because Pafford complains that the search evidenced discriminatory or

**11.** A number of Caucasian Wage–Hour Investigators in the Indianapolis District Office were not promoted or were terminated while Pafford was employed at the DOL (1987 through 1992). Carol Atkinson never progressed beyond the GS–9 level and, in fact, requested reassignment to the position of GS–7 Wage–Hour Assistant. Linda Stalion, an investigator in the Evansville Field Office, likewise never advanced beyond the GS–9 level. She was counseled about her poor performance and advised that if she did not improve she would be placed on a Performance Improvement Plan ("PIP"). Stalion subsequently sus-

tained an injury while at work, resulting in her taking leave without pay. Ultimately, the DOL discharged her for excessive leave without pay. Charles McCormick, a disabled veteran, was not promoted to the GS–11 level after a year at the GS–9 level and ultimately accepted disability retirement. Finally, David Filbey became a GS–7 investigator in June 1990, having been elevated from a student trainee. Filbey was not promoted to the GS–9 level, and in 1993 sought and received reassignment to the position of GS–9 Wage-Hour Assistant.

retaliatory animus, Title VII standards apply.

■ Pafford argues that the district court ignored her testimony that Wyzguski told her that he considered an incident of violence by an "oriental" student in deciding to screen her for weapons. Given the district court's characterization of the weapons screening incident as a retaliation claim related to Pafford's complaints of discrimination, it is understandable why the district court did not address this racial comment. However, this statement alone does not defeat the DOL's motion for summary judgment on this claim. According to Wyzguski's affidavit, he based his decision on more than the incident of violence committed by an Asian college student. He also considered Hooton's concern for her safety, that Pafford had come into his office and cried on several occasions, the rumor that Pafford owned a gun and carried it in her car or on her person, and a recent incident in which a postal employee shot and killed his supervisor and then committed suicide. The fact that Wyzguski had previously referred Pafford to the Employee Assistance Program for counseling based on her emotional condition lends credence to the DOL's proffered reason for the screening.[12] Pafford has not come forward with sufficient evidence to demonstrate that the offered reason was merely a pretext for discrimination.

Pafford also contends that the trial judge ignored Wyzguski's testimony that he told Klipsch that the search was no longer necessary. Pafford asserts that Klipsch's decision to continue the search in the face of Wyzguski's recommendation creates a genuine issue of fact regarding whether the search was necessary or harassment. The fact that Klipsch reinstated the screening is not evidence of discrimination or retaliation. It simply demonstrates a different assessment of the evidence regarding the danger posed by Pafford.

#### b.  Termination

■ Pafford argues that the district court erred in relying on her absenteeism and failure to follow instructions as a legitimate nondiscriminatory reason for her termination. Although unclear from her brief, she seems to contend that the leave restriction was discriminatory and, therefore, that her absences could not be a nondiscriminatory reason for terminating her.

Because Pafford has failed to demonstrate that the leave restriction was motivated by her race or national origin, she cannot prevail on this argument. She attempts to show that Caucasian employees Linda Stalion and Charles McCormick were allowed to take leave without pay for more than one year, yet were not subjected to a leave restriction. But she fails to establish that she is similarly situated to either of these employees. The leave restriction imposed on Pafford followed a series of absences totaling 77 days. There is no evidence that McCormick or Stalion had past absences of comparable magnitude. Furthermore, Stalion, like Pafford, was terminated due to excessive leave without pay. Thus, there is no evidence that Pafford's leave restriction was imposed for a discriminatory reason, defeating Pafford's argument that her absences were not a nondiscriminatory reason for her termination.

Pafford next cites Filbey's and Atkinson's voluntary demotions as evidence of discrimination, arguing that she was not given the opportunity to be demoted rather than terminated. The fact that the DOL agreed to demote these employees is not relevant in this case because Pafford does not allege that she ever sought demotion. On the contrary, it was a promotion that she was after.

Finally, Pafford argues that her termination constituted retaliation for having filed a complaint of discrimination because the notice of proposed removal was issued within a week of her filing suit in the district court. She also points out that Hooton rejected her medical excuse due to an illegible physician's signature immediately after she filed her formal administrative complaint of discrimination in September 1991.

---

12.  Although Pafford did give her union representative an article about stress and violence in the workplace, she did so after Wyzguski and Klipsch ordered the search and thus the article could not have entered into their decisionmaking process.

Although the timing of the termination notice may be sufficient to establish a prima facie case of retaliation, Pafford lacks any evidence demonstrating that the DOL's offered reason for terminating her is pretextual. Pafford's long history of absenteeism negates any inference that the notice of removal was retaliatory. Pafford was warned in July 1991 that failure to comply with the leave restriction and excessive absences without leave could lead to termination, yet her absences persisted thereafter. Pafford's leave restriction was twice extended for an additional six months due to her failure to adhere to its requirements, and Pafford was absent without leave for the last four months of her employment. Because she has failed to show that her termination was a pretext for retaliation or discrimination, the DOL was entitled to summary judgment on this claim.

#### c. Denial of Transfer

Pafford argues that the district court erred in accepting Klipsch's statement that Pafford's request for transfer exceeded the scope of her authority for personnel transactions, which was limited to the Indianapolis District Office. Pafford maintains that Klipsch's reason for denying her transfer was not legitimate because although Klipsch did not have final authority over the transfer, she did have the authority to initiate the transfer but refused to do so. We need not reach the merits of this argument because it is clear that Klipsch did not take any adverse action against Pafford, defeating her prima facie case of retaliation. Although Klipsch could have initiated the transfer, the denial of Pafford's request ultimately came from Alfred Perry in the Atlanta Regional Office, who stated that a transfer was not possible at that time because the staffing level of the region exceeded its allocated level.

#### 4. MSPB Decision

Pafford argues that the district court's grant of summary judgment on her MSPB appeal must be reversed for the same reasons as the decision regarding her Title VII claims. Because the claims raised in Pafford's MSPB appeal are subsumed within her Title VII claims, we need not address them separately.

### III. CONCLUSION

Pafford has failed to raise an inference of discrimination with respect to her claims of discrimination and retaliation. For the foregoing reasons, we AFFIRM the judgment of the district court.