In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3613

Nikolas Malacara,

Plaintiff-Appellant,

v.

City of Madison, City of Madison Water Utility
Division, Chuck Englehart, Gail Glasser
and George Holden,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98-C-854-C--Barbara B. Crabb, Judge.

Argued April 3, 2000--Decided August 18, 2000

   Before Flaum, Chief Judge, and Bauer and Williams,
Circuit Judges.

   Bauer, Circuit Judge.  Nikolas Malacara, a
Hispanic male, began working for the City of
Madison in 1987 as a seasonal maintenance
employee in the City's Parks Division. In 1989,
he was given a permanent position as a
Maintenance Worker I in the Water Utility Supply
Section where he remains today. During this time,
Malacara requested cross training in other jobs
within the Water Utility. All cross-training
requests are handled by the employees supervisor,
in this case Earl Cheek. Malacara claims that all
his requests were denied. Then in 1995, he
applied, but was not hired, for a Maintenance
Mechanic I position.

   Malacara filed suit claiming that he was
racially discriminated against by not being
allowed to cross-train and by not being hired for
the Maintenance Mechanic I position, in violation
of 42 U.S.C. sec.sec. 1981 and 1983 and Title
VII. The district court granted a motion for
summary judgment finding that no reasonable jury
could conclude by a preponderance of the evidence
that the defendants discriminated against
Malacara on the basis of race. Malacara appeals
that decision.

We review de novo the district court's granting of summary judgment. Miranda v. Wisconsin Power & Light Company, 91 F.3d 1011, 1014 (7th Cir. 1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We must view the evidence in favor of the nonmoving party. Miranda, at 1014.

Because Malacara did not present direct evidence that he was discriminated against by defendants' failure to promote him or provide him training in maintenance, the district court used the burden shifting formula established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–805 (1973), to determine whether discrimination occurred. In a failure to train claim the plaintiff must demonstrate: (1) that he is a member of a protected group; (2) that the City of Madison Water Utility Division provided training to its employees; (3) that he was eligible for training; and (4) that he was not provided training under circumstances giving rise to an inference of discrimination, i.e., that he was denied training given to other similarly situated employees who were not members of the protected group. Pafford v. Herman, 148 F.3d 658, 667 (7th Cir. 1998). In order to establish a prima facie case of race discrimination Malacara must show: (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) the position was given to someone of a different race who had similar or lesser qualifications. Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995).

Once the prima facie case is established, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Miranda, at 1015. The burden of persuasion remains with the plaintiff at all times. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendant articulates a nondiscriminatory reason, it has satisfied its burden and the plaintiff must then establish that defendant's reasons were pretextual. Id.; Perdomo, at 144. Applying this formula, the district court determined that no reasonable jury could find that race played a role in the defendant's failure to train claim or the decision not to hire Malacara for the Maintenance Mechanic I position.

The district court determined that the defendants met their burden of production and did not address whether Malacara established a prima facie case. Where the defendant has met its burden, it is irrelevant whether a prima facie case has been made. Sample v. Aldi, 61 F.3d 544 (7th Cir. 1995). Because we agree with the district court's determination that the defendants met their burden of production under McDonnell Douglas, we will not address whether a prima facie case was in fact established. Defendants established several legitimate, nondiscriminatory reasons for not cross-training or hiring Malacara.

Malacara argues that Tim Sullivan received opportunities to cross-train that he did not. Sullivan, a white male, was hired in 1994 as an hourly employee in the Supply Section. Specifically, Malacara asked for cross-training in the Maintenance Section. In 1994, Cheek lent Sullivan to the Maintenance department instead of Malacara, citing staffing shortages and his preference to move hourly employees.

Cheek considered Sullivan's transfer as a temporary employee loan, not a training transfer. He testified that it was his general practice to transfer hourly employees rather than permanent employees. Cheek loaned Sullivan, an hourly employee, rather than Malacara because he had less regularized duties. Malacara, a permanent employee, had set job responsibilities which were harder to replace. Sullivan was lent to alleviate a staff shortage, not for the purposes of training. Malacara was told he could not be spared. This was not an uncommon reason to deny employees requests. He contends that the shortage was in Sullivan's position and not in his. The fact remains however that the decision was within Cheek's discretion of who to loan to the Maintenance Section.

Other employees were denied cross-training as well. Theresa Peters verbally requested cross-training and was told that "it was not a good time to do cross-training." Frank Rane and Jack Henderson, both white employees, were denied their requests in writing. Further, defendants established that Malacara did in fact receive cross-training on at least two occasions, including meter-reading in the Supply Section and training in the Distribution Section. There is no evidence that the plaintiff was treated differently than similarly situated employees in his request for cross-training nor is there any evidence that race was a factor in those decisions. The district court properly dismissed Malacara's cross-training claims.

Malacara next argues that defendants failed to promote him to the position of Maintenance Mechanic I because of race. Chuck Englehart and Gail Glasser conducted the interviews of the certified candidates. They used the same questions and topic material for each candidate. Each interview began with a description of the duties of the position. Again, we will only discuss whether the defendants established legitimate, nondiscriminatory reasons for not promoting Malacara.

First, the defendants' decision was based on which candidate they believed to have the most relevant experience for the duties of Maintenance Mechanic I position, not on race. The Maintenance Mechanic I position required more advanced skills than Malacara possessed. Malacara's experience involved janitorial and lawn care work. Much of the experience Malacara indicated on his application included informal jobs for his family or friends and described them as being "sporadic." He failed to provide in his application the information necessary for the defendants to verify these experiences. The defendants determined that while he had some related experience, he lacked the direct experience that Sullivan possessed.

Sullivan provided the information necessary to verify his work history. He had held numerous positions relating to maintenance. He worked in the service and parts departments for several golf cart manufacturers with duties which included tune-ups and major overhauls of golf carts and utility vehicles. While working for the Water Utility, Sullivan maintained fans and pumps, heating and ventilating equipment, repaired chlorinators and fluoridators, valves and other equipment in the pump houses, and removed, installed, and repaired well pumps and booster pumps. These are all tasks that were part of the primary duties listed for a Maintenance Mechanic I and which could be verified.

Englehart and Glasser found that Sullivan provided a more accurate, complete understanding of the responsibilities and expectations of a Maintenance Mechanic I than Malacara did during his interview. Sullivan exhibited a better understanding that the responsibilities included repair and maintenance of in-unit wells and buildings. Without personal knowledge of Sullivan's responses, Malacara can not dispute the defendants' opinion that Sullivan had a more accurate understanding than him.

Finally, defendants argue that their prior experience with each of the candidates and the

work histories within the Water Utility played an important role in their decision. Malacara had several instances of unsafe conduct that violated the Water Utility Safety policies. Malacara had been seen by Cheek riding on top of a lawn tractor's backrest. He was told to sit down and that it was unsafe. Glasser and Englehart witnessed Malacara make a right hand turn directly in front of a Madison Metro bus in a Water Utility vehicle. Englehart also witnessed him recklessly back into a well unit door with a Water Utility vehicle. Englehart further believed him to be sloppy from his observations when they were co-workers. These instances reflected poorly on Malacara's application for the Maintenance Mechanic I position. The other candidates, Sullivan, Peters and Henderson, had good work histories.

The defendants determined that Sullivan was the more qualified candidate for the position and went on to say that had Sullivan not taken the job, the position would have been offered to Peters and then Henderson, and if they had declined, they would have interviewed a new pool of applicants.

Defendants established legitimate, non-discriminatory reasons for not hiring Malacara. An employer may hire or refuse to hire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for discriminatory reason." Bruno v. City of Crown Point, Ind., 950 F.2d 355, 364 (7th Cir. 1991) (quoting Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984)). There is no evidence that a reasonable jury could find that the defendants failed to hire Malacara based on race.

The district court correctly found that Malacara failed to satisfy his burden on summary judgment and properly granted judgment for the defendant on both his failure to cross-train and failure to hire claims. Affirmed.

Williams, Circuit Judge, dissenting in part. Although I agree with my colleagues' assessment of Malacara's failure to train claim, I must disagree with their conclusion that no reasonable juror could find that defendants failed to promote Malacara on the basis of race. In reviewing Malacara's claims, the majority focuses solely on the issue of whether defendants established a "legitimate, nondiscriminatory

reason for not promoting Malacara." Since both parties already agree that defendants met their burden, which is merely one of production, the proper focus should be on whether or not Malacara has presented sufficient evidence to create a genuine issue as to whether or not the proffered reason is pretextual. Instead of doing this, however, my colleagues rely solely on defendants' version of the evidence and give little or no credence to Malacara's version.

The line which purports to distinguish the questions that are to be examined by a trier of fact from those that are to be decided by a judge can at times be difficult to discern. Walking this line becomes particularly problematic for the judge contemplating a motion for summary judgment involving claims of discrimination in the workplace, as is the case here. Taking note of this difficulty, the Supreme Court has recently offered guidance in the form of Reeves v. Sanderson Plumbing Prods., Inc., ___ U.S. ___, 129 S.Ct. 2097, 2110 (2000). In Reeves, the Court reviewed a plaintiff's ADA claim on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. The case nonetheless offers important guidance, since the method of proof in ADA and Title VII cases is similar and the standard for Rule 50 motions mirror the standard used in Rule 56 summary judgment motions.

The Reeves Court focuses on the plaintiff's burden to create a genuine issue as to pretext. The Court's decision reinforces the notion that when considering whether sufficient evidence exists to submit a question to the jury, a court need look only to the evidence and reasonable inferences that tend to support the case of the non-moving party. "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses'" Id. at 2110 (citing 9A C. Wright & A. Miller, Federal Practice and Procedure sec.2529, 300 (2d ed. 1995)). With the decision in this case, the majority does exactly what the Supreme Court in Reeves expressly proscribes. They have "disregarded critical evidence favorable to petitioner--namely, the evidence supporting petitioner's prima facie case and undermining respondent's nondiscriminatory explanation." Id. at 2111. A review of the facts that are absent from the majority opinion, but found in the record, is instructive and is necessary for analysis of the pretext issue.

In his position as Maintenance Worker I, Malacara worked under the direct supervision of Earl Cheek ("Cheek") and was responsible for

basic maintenance as well as maintenance and repair of grounds-keeping equipment. Malacara has experience in maintenance and repair and hoped to one day obtain a position as a Maintenance Mechanic I with the City. Malacara informed Cheek that he would like to obtain job assignments and training in the Maintenance Section, so that he could gain the experience needed to qualify for a permanent job as a Maintenance Mechanic. Malacara also made his desire to work as a Maintenance Mechanic known to the Division Operations Manager, George Holden ("Holden"). Holden discouraged Malacara and told him that the move he was hoping to make was a very big one and that "that just wasn't done." The union steward, Alice Grob ("Grob"), testified that minorities at the Water Utility Division are given more discipline and fewer opportunities for advancement, while less qualified, white employees are provided ample training opportunities and career guidance.

In April 1994, the City hired Tom Sullivan ("Sullivan"), a white male. Initially, Sullivan was assigned to grounds-keeping and worked with Malacara. In mid-1994, Sullivan was given a work assignment in the Maintenance Section. In mid-1995, Sullivan was given a permanent position as a Maintenance Worker I in the Water Utility Division, Distribution Section, but was loaned back to the Maintenance Section where there was a staff shortage. The union contract prohibited the City from hiring hourly employees to fill in permanent positions. Since Sullivan had been an hourly employee, Malacara voiced his objection to Sullivan's hiring.

In the spring of 1995, the permanent position for Maintenance Mechanic I opened and both Malacara and Sullivan applied. The minimum qualifications for the position included: (1) three years experience in skilled building and mechanical repair work and (2) knowledge of and ability to perform skilled building and maintenance repair tasks. The parties dispute the level of experience each applicant had. Malacara had more formal education in electronics, home and auto repair, plumbing and welding than Sullivan. However, in the Water Utility Division, he spent most of his time on the lawn crew, from 1989 to the time he filed suit. Malacara says he performed some maintenance, and appellees admit that he received some training in meter reading. Appellees discount Malacara's experiences before joining the City as work for family and friends and sporadic home and auto repair. Sullivan had prior experience working on golf-carts and experience with the Water Utility Division in the Maintenance Section. During his time with the City, he performed some grounds-keeping tasks and

did some work at Water Utility buildings.

Judy Hughes ("Hughes") of the City's Human Resource's department screened all applications for basic minimum qualifications, and then conducted a series of tests and compiled a list ranking all remaining applicants for the Maintenance Mechanic I position ("certification process"). This process was done whenever a new position became available. Under the City's hiring policy, candidates were informed that their ranking on the eligibility list does not necessarily translate into departmental preference for the hiring decision. Malacara scored well on the tests and the experience ranking. He got the highest score on the test and when his work history was evaluated, he received 40 points. Sullivan received less than 17 points and had the second lowest work history rating. Overall, Malacara tied for second in the final ranking. Sullivan was ranked second to last. When Glasser and Englehart later reviewed the same information about Malacara's work history, they concluded that Malacara did not meet minimum qualifications.

As for Malacara's performance record on the job, he was never formally disciplined for any of the three separate incidents Glasser and Englehart say colored Malacara's record. He was never told his work was deficient or that he had committed a safety violation. Malacara explains that he sat on the top of the backseat of the tractor because the grass he was cutting would get in his eyes, but after he received safety goggles, he discontinued the practice. Further, Malacara claims that Glasser laughed about his incident with the bus and that Englehart left the well unit door open that he hit with the City truck. Additionally, while Englehart had formed the impression that Malacara did sloppy work when they were co-workers, Cheek, Malacara's immediate supervisor, reported favorably on Malacara when asked for an evaluation of his work. Glasser contends that Cheek told her otherwise.

In addition, Malacara reported to the City's affirmative action office that he had been discriminated against. Grob testified that a worker in that office, Nancy Curtis ("Curtis"), wondered why Malacara was not hired even though Curtis told Malacara he had not suffered from discrimination. However, Curtis informed Grob that the real reason Malacara was not hired was because Glasser believed Malacara was the kind of Hispanic other Hispanics did not want in their community. When Malacara confronted Glasser about the hiring decision, she responded that the best candidate had been hired. She did not inform Malacara that he was not qualified or that he had

committed safety violations. Malacara later received a memo from Glasser detailing his perceived deficiencies.

While these facts do not all necessarily work in Malacara's favor, they certainly offer a different picture of the case than that presented in the majority opinion. The real issue in this case is whether defendant's proffered explanation for not promoting Malacara is pretextual. When examining this issue with Malacara's facts and only defendants' uncontradicted evidence in mind, as Reeves says we must, it becomes clear that a genuine issue does exist.

Pretext can be established "by proving one of the following: '(1) [d]efendant's explanation had no basis in fact, or (2) the explanation was not the real reason, or (3) at least, the reason stated was insufficient to warrant'" the adverse job action. Hughes, 20 F.3d 745, 747 (7th Cir. 1994), (quoting Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994)). The question in cases turning on pretext is "whether [plaintiff] has created a genuine issue concerning the sincerity of the proffered reasons" given for the adverse employment action. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir. 1993).


In my view, the facts surrounding this issue present a text-book example of an issue that should proceed to trial--it is classic "he said, she said." This time, however, defendants are the ones with the self-serving affidavits and the plaintiff has the objective evidence. Appellees argue that Malacara's reliance upon the objective evaluation measures, which rank Malacara higher than Sullivan, is misplaced. Yet, the test scores and eligibility list rankings, while not binding on Glasser and Englehart when they made their decision, are certainly probative here. Regardless of whether Glasser and Englehart were bound by the rankings and test scores, these measures suggest Malacara was more qualified than Sullivan. While appellees present evidence that Malacara was not qualified, in the form of affidavits and deposition testimony from Glasser and Englehart, Malacara presents evidence, in the form of a high test score, a high relevant experience ranking, and positive evaluations of his work by his immediate supervisor, that he was.

Furthermore, appellees maintain that Sullivan worked eighteen months in the Maintenance Division getting "on-the-job" experience. However, there is testimony that Sullivan was just a helper and was not really working as a maintenance mechanic. This calls into question

whether the eighteen month stint on loan to the Maintenance section was as valuable, for Sullivan, as appellees claim. Of course, Malacara maintains that this experience is exactly what he had requested on several occasions and had been denied the opportunity to get that experience. Moreover, he actually did obtain some experience performing tasks similar to those required by a Maintenance Mechanic I employee. Appellees state that Malacara obtained "extensive cross-training in the Distribution section" and while there, "received training as an Operator I driving dump trucks as well as lead replacement experience, and experience repairing mains, repairing and replacing hydrants, and installing valves and services." Appellees Br. at 34. This contradicts their claim that "[p]rior to applying for the Maintenance Mechanic I position, all of Plaintiff's work for the City of Madison and in the Water Utility involved janitorial and lawn care work." Appellees Br. at 46.

In addition, a close look at all of the evidence raises several questions as to the veracity of appellees' proffered reasons for not promoting Malacara. This court has held that plaintiffs may establish pretext by "simply attack[ing] the credibility of the employer's proffered reason for termination." McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 372 (7th Cir. 1992). In defense of their actions, appellees contend that they failed to promote Malacara because he was, in fact, not qualified for the Maintenance Mechanic I position, that his application was inadequate, his interview unsatisfactory and his work record tainted by reports of sloppiness and unsafe behavior. A number of inconsistent facts belie this contention.

First, Glasser claims Malacara did not provide reference numbers for his prior employers or sufficient descriptions of his past work experience and that this prevented her from verifying the true extent of his qualifications. At the same time, Malacara presented evidence that she took notes saying his references were "OK." According to Malacara, Glasser also reported that she did not need his references because she would check with his supervisor at the City. This is conflicting testimony that calls into question the veracity of Glasser's explanation.

Second, the interview ratings calculated by Glasser and Englehart were more subjective measures, albeit important and legitimate ones, than those obtained in the certification process. In contrast, the more objective evidence, test scores and work history scores suggest that

Malacara was at least one of the most qualified candidates and certainly more qualified than Sullivan. Glasser and Englehart reviewed the exact same work experience information as Hughes did, yet they came to a completely different conclusion. The conflicting valuations of Malacara's work experience present an important question of fact and raise questions about Glasser and Englehart's subjective determination.

Third, there is nothing in the record, besides Englehart and Glasser's self-serving testimony, to suggest that Malacara had performed his job unsatisfactorily or even sloppily, as appellees indicate. Malacara's direct supervisor, Cheek, is reported to have given Malacara a favorable evaluation. However, Glasser says Cheek gave a less than positive appraisal of Malacara's work. This, of course, is another fact question. Furthermore, while appellees point to three separate incidents to establish Malacara's sloppiness and disregard for safety and as the major reason he was not promoted, Malacara's official performance record is clean. He was never formally (or informally) disciplined.

Malacara's pre-interview test scores, his work history rankings, his performance record, Sullivan's arguably lesser qualifications, Cheek's positive appraisal of Malacara's work, the contradicted reports of Malacara's alleged sloppy work and contradictory statements regarding the type of experience Malacara received at the City call into question the veracity of appellees' proffered reason for not promoting Malacara. "[I]f a plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent." McCoy, 957 F.2d at 372.

Rarely have I seen a set of facts so clearly pointing to the need for resolution before a trier of fact. The court will not render summary judgment if "a reasonable jury could return a verdict for the nonmoving party." Sullivan v. Cox, 78 F.3d 322, 325 (7th Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). This summary judgment standard is to be applied rigorously where intent and credibility are central issues. Wohl v. Spectra Manufacturing, 94 F.3d 353, 354 (7th Cir. 1996). Appellees' intentions and credibility are the crux of the case here. Malacara presents ample evidence to call into question the intentions and credibility of both Glasser and Englehart and to

suggest that the reasons offered to support the decision to promote Sullivan were a pretext for discrimination. If Malacara presented sufficient evidence that appellees proffered reasons were "unworthy of credence" then he has shown pretext. See Johnson v. University of Wisconsin-Milwaukee, 783 F.2d 59, 63 (7th Cir. 1986). At the very least, there was enough evidence here to send the case to a jury so that a trier of fact could decide the issue. Accordingly, I respectfully dissent.