The MIDWESTERN INDEMNITY
COMPANY, Plaintiff,

v.

Daniel LAIKIN d/b/a Garden City Group d/b/a Flora Group, Flora Estate, Shady Pines, Cossell Group, Pat Skaggs and Lorrie Skaggs as next friends of Amber Nicole Mitchell and Patricia Skaggs, Defendants.

No. IP 96-0830-C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Aug. 16, 2000.

Jeffrey A. Doty, Kightlinger & Gray, Indianapolis, IN, for plaintiff.

James A. Mellowitz, Price Potter Jackson & Mellowitz, Indianapolis, IN, for defendants.

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

After a deadly fire in a mobile home, plaintiff Midwestern Indemnity Company sued here for a declaratory judgment that it owed no duty of coverage or defense for the loss. Defendants here are the owners and managers of the mobile home in which the fire occurred, Daniel Laikin and businesses he operates (collectively, "the Cossell Group"), and the Skaggs family, who were renting the mobile home from the Cossell Group and who were injured in the fire. While this declaratory judgment action has been pending, the Cossell Group and the Skaggs family settled their dispute through a consent judgment in state court. The Cossell Group paid $300,000 to the Skaggs family, which was less than the consent judgment's face amount of $1.6 million. The Skaggs family agreed to collect the difference only from the insurer Midwestern, not from the assets of the Cossell Group.

The parties in this case have filed cross-motions for summary judgment that present the following principal issues: (a) assuming coverage is eventually established at trial, whether the consent judgment will have any binding effect on the insurer as to issues of its insured's liability or the injured family's damages; (b) whether the consent judgment was the product of bad faith or collusion or was unreasonable in its terms; and (c) whether the covenant not to execute relieves the insurer of all liability here on the theory that its insured is not "legally obligated to pay" any amount now being sought from the insurer.

As explained below, this court predicts the Indiana courts would hold that: (a) the consent judgment is binding on the insurer

as to issues of the insured's liability and damages; (b) as a matter of law, the consent judgment was reasonable and was not the product of bad faith or collusion; and (c) the covenant not to execute does not relieve the insurer of any obligation to pay up to its policy limits toward the consent judgment. On a separate issue, the court also holds that any possible consequences of the Skaggs' failure to list their personal injury claims as assets in a bankruptcy filing have been cured by later ratification by the bankruptcy trustee. Accordingly, this case shall proceed to trial on the contested coverage issues, which turn on disputed issues of fact.

### Undisputed Facts Relevant to the Consent Judgment

This entry addresses the second round of summary judgment motions in a long fought insurance dispute arising out of a deadly fire on October 7, 1989. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, the court should grant summary judgment if and only if the record shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir.1998). The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When considering the plaintiff's motion for summary judgment, the court must consider the evidence in the light reasonably most favorable to the defendants, and vice versa.

The facts material to the pending motions are undisputed, at least for purposes of the motions. The court has included as background to the issues here some facts established by the first round of summary judgment motions in this case. (References to "Laikin Ex.--" refer to exhibits filed in support of the defendants' response to plaintiff's first motion for summary judgment.)

On October 7, 1989, Patrick and Lorrie Skaggs, Amber Nicole Mitchell, and Patricia Skaggs were all living in a rented mobile home in the Shady Pines mobile home park, which was owned and operated by Laikin and/or the Cossell Group. A fire began in the mobile home that morning. The fire killed Amber, who was five years old. Patricia, who was three years old, and Lorrie both suffered smoke inhalation and other injuries. Patrick suffered extensive burn injuries.

The back door of the mobile home had been chained and wired shut from the outside by a property manager for the Cossell Group. Both the Wayne Township Fire Department and the Marion County Sheriff investigated the fire and issued reports. Laikin Exs. 7, 8. The fire department concluded that the fire began in the lounge area of the mobile home as a result of a faulty outlet. Laikin Ex. 8 (Structure Fire Investigation Report).

In June 1989, plaintiff Midwestern Indemnity Company had received a request for liability coverage of Laikin's mobile home parks from Paul Nelson, an insurance agent with the Landmark Insurance agency. Midwestern underwriter Jan McWhirter denied that application. On October 4, 1989, three days before the fire, Nelson issued an insurance binder to Laikin for general liability insurance coverage by Midwestern of the Shady Pines mobile home park. Laikin Ex. 6. The effective date of the binder was backdated to August 27, 1989. *Id.* The record contains no actual insurance policy issued by Midwestern pursuant to the binder. Midwestern issued a later policy that McWhirter approved covering Laikin's mobile home parks, including Shady Pines, effective September 1, 1990. Cplt. Ex. A. That policy provides that Midwestern "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Id.*

On March 31, 1995, the Skaggs filed suit in the Marion Superior Court against the owners and managers of Shady Pines for the death of Amber Nicole Mitchell and injuries to Patrick, Patricia, and Lorrie caused by the fire. The Cossell Group was added as a defendant in that lawsuit on June 2, 1995. The Skaggs alleged that the defendants had breached the implied warranty of habitability, resulting in the wrongful death of Amber Nicole Mitchell, severe burn injuries to Patrick Skaggs resulting in a 10 percent permanent partial impairment, psychological injuries to Lorrie Skaggs and Patricia Skaggs, as well as other injuries and damages. Def. Ex. 3.

On November 1, 1995, the Cossell Group moved to dismiss the Skaggs' suit in the Marion Superior Court. The motion argued that the applicable statute of limitations was the two-year statute for a personal injury claim rather than the six-year statute for breach of an implied warranty of habitability. Def. Resp. Ex. 11. The trial court denied the motion on February 27, 1996. Def. Resp. Ex. 10.

On March 1, 1996, the Cossell Group formally demanded that Midwestern provide indemnification and defend it against the Skaggs' suit. Midwestern denied coverage, claiming that the Cossell Group's insurance policy provided coverage only after September 1, 1990, after the fire and the loss had occurred. Laikin Aff. ¶ 3. Midwestern filed its Complaint for Declaratory Judgment in this court on June 10, 1996, seeking a declaration that it owed no duty of defense or indemnification to the Cossell Group for damages arising from the Skaggs' lawsuit. The Cossell Group answered and filed a counterclaim against Midwestern for bad faith denial of coverage.

On April 27, 1998, this court denied Midwestern's motion for summary judgment on the issue of insurance coverage. The court found that factual disputes as to Nelson's authority to issue the insurance

binder in 1989, the timing of Laikin's notice of the fire, and whether Midwestern was actually prejudiced by the long delay in notice of the fire all barred summary judgment on the issue of coverage. For purposes of the present motions, the court must assume that those issues will ultimately be resolved in favor of finding coverage.[1] In the same entry, however, the court granted summary judgment to Midwestern on Laikin's counterclaim for bad faith denial of coverage.

On November 13, 1998, the Cossell Group and the other state court defendants in the Skaggs' lawsuit filed a motion for judgment on the pleadings based again on a statute of limitations defense. While the motion was pending, all parties attended a mediation in December 1998. Although Midwestern attended the mediation, it left before the mediation ended. Laikin Aff. ¶ 6.

During the mediation, the Skaggs and the Cossell Group reached a settlement. The settlement agreement stated that "Cossell agrees that all statute of limitation defenses are waived" and provided for a cash payment of $300,000 to the Skaggs family by the general partners of the Cossell Group. Def. Ex. 2. As part of the settlement, the Cossell Group also assigned all its rights and claims against Midwestern Indemnity to the Skaggs family. *Id.* To implement the settlement, the Cossell Group submitted to the Marion Superior Court a confession of judgment against the Cossell Group in the amount of $1.6 million for actual and compensatory damages. However, the Skaggs agreed not to execute the judgment against any asset other than the (putative) Midwestern insurance policy. The state court approved the confession of judgment on February 19, 1999. Def. Ex. 1. The Cossell Group paid in excess of $62,000 in legal fees and costs in its defense against the Skaggs litigation. Laikin Aff. ¶ 5.

---

1. For that reason, this court refers to Laikin and the Cossell Group in this entry as the "insured," although whether they were in fact "insured" remains a hotly disputed issue for trial.

At the same time the Skaggs settled with the Cossell Group, they also entered into a settlement agreement with Jackson Kearns and Kenneth Lloyd; both had worked for Laikin, but their precise roles in these events have been disputed. The Skaggs agreed not to sue or execute any judgment against Kearns and Lloyd, who agreed to make periodic payments to the Skaggs family. Def. Resp. Ex. 4. Shelby Insurance, the insurance carrier for Kearns and Lloyd, paid $300,000 to resolve the Skaggs' claims, although Shelby's separate action for declaratory judgment to avoid coverage for the fire remained pending. Def. Resp. Exs. 4, 12.

Then in this case, on March 4, 1999, Midwestern filed a supplemental answer to Laikin's counterclaim for coverage, adding two additional defenses: (1) that it has no duty to pay the consent judgment to the extent the judgment was procured by fraud, collusion, or bad faith; and (2) that it has no duty to pay the consent judgment because the insureds are not legally obligated to pay damages in connection with the consent judgment.

The Cossell Group and the other defendants have filed a motion for partial summary judgment on these new defenses to coverage. Midwestern also has filed a motion for summary judgment, arguing that it has no duty to satisfy the underlying consent judgment against Cossell Group even if coverage were shown. On June 30, 2000, the court heard oral argument on the motions and they are now ripe for decision. Other undisputed facts are noted below as needed.

## Discussion

Indiana law controls the parties' claims and defenses in this diversity action. The Supreme Court of Indiana has not directly addressed the issues presented here. This court's duty is to use available indicators of Indiana law to predict how the Supreme Court of Indiana would resolve these issues. See, *e.g., General Accident Ins. Co. of America v. Gonzales,* 86 F.3d 673, 675 (7th Cir.1996).

All the motions and issues now pending assume both that Midwestern in fact agreed to provide liability coverage to the Cossell Group in 1989 and that Midwestern has breached its contract by refusing to provide a defense and indemnity for the losses arising from the fire in the Skaggs' mobile home.

When a liability insurer incorrectly denies coverage to its insured, the insured faces the plaintiffs in the underlying lawsuit without the help of the insurer. The insured may face the threat of catastrophic uninsured liability. In such a case, the insured and the plaintiff in the tort lawsuit may reach an agreed resolution that allows the plaintiff to seek recovery from the insurer. It is not unusual for such agreements to take the form of agreed judgments against the insured, including provisions that the injured plaintiff will not execute on all or some portion of the judgment except to collect on the insurance policy. That is what happened here. The central question here is what effect that consent judgment has in this lawsuit in which the insurer seeks a declaratory judgment to the effect that it owes no coverage to the Cossell Group.

The parties' motions for summary judgment propose three different approaches. First, defendants the Skaggs family and the Cossell Group contend that the consent judgment between them is binding on Midwestern on issues of both the Cossell Group's liability to the Skaggs and the extent of the Skaggs' damages. Defendants acknowledge that Midwestern remains entitled in this case to a trial on the factual issues affecting whether it owes any duty of coverage for the loss. But defendants believe the trial should be limited to those issues, so that if the jury finds coverage, the Skaggs family will be entitled to the $1 million policy limits.

Midwestern argues for a second approach in which the consent judgment simply has no effect on Midwestern because it was not a party to it. Midwestern contends the trial in this case should include, in addition to factual questions affecting in-

surance coverage, the issues of the Cossell Group's liability to the Skaggs for the fire and the extent of the Skaggs' damages, as well.

In the alternative, Midwestern argues for a third approach under which the consent judgment actually would relieve Midwestern of any potential liability here. Midwestern contends it is entitled to this result for two independent reasons: (1) because the consent judgment was a product of bad faith and collusion between the Cossell Group and the Skaggs, and (2) because its insured is not actually "legally obligated to pay" any of the sums now being sought from Midwestern.

Thus, the principal issues before the court are these: First, because Midwestern itself was not a party to the consent judgment, does that judgment bind Midwestern as to issues of the Cossell Group's liability or the Skaggs' damages? The court holds that if defendants can show at trial that Midwestern owed the Cossell Group coverage for the loss, then the consent judgment precludes Midwestern from re-litigating the issues of the Cossell Group's liability or the Skaggs' damages, so long as the consent judgment fell within a broad range of reasonable resolutions of the case and was not the product of bad faith or collusion.

Second, is there evidence that the consent judgment between the Skaggs and the Cossell Group was unreasonable or the result of bad faith or collusion so as to relieve Midwestern of potential liability for coverage in this case? The court holds that, as a matter of law, there is no such evidence. The undisputed evidence shows that the consent judgment was not an unreasonable resolution of the case.

Third, does the covenant not to execute relieve Midwestern of any potential liability on the theory that its insured is not "legally obligated to pay" any amount of the consent judgment beyond the $300,000 it actually paid in cash? The court holds that the "legally obligated to pay" language in the applicable policy cannot relieve Midwestern of potential liability here.

A. *Issue Preclusion on Liability and Damages*

■ A principal portion of Midwestern's motion for summary judgment argues that, because it was not a party to the consent judgment, it is not bound by that judgment in any respect. Issue preclusion, or collateral estoppel, "bars subsequent relitigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit." *Small v. Centocor, Inc.,* 731 N.E.2d 22, 23 (Ind. App.2000), citing *Slutsky v. Crews,* 713 N.E.2d 288, 291 (Ind.App.1999). Thus, when there has been a final judgment on the merits in a prior action, when the issues are identical, and when the party to be estopped from relitigating the issue was a party or in privity with a party in the prior action, collateral estoppel applies to bar relitigation of a fact or issue. *Small,* 731 N.E.2d at 28, citing *Adams v. Marion County Office of Family and Children,* 659 N.E.2d 202, 205 (Ind.App.1995).

■ An insurer is normally treated as being in privity with its insured for purposes of collateral estoppel or issue preclusion. "The doctrine of collateral estoppel applies to insurance contracts and an insurer is ordinarily bound by the result of litigation to which its insured is a party, so long as the insurer had notice and the opportunity to control the proceedings." *Liberty Mutual Ins. Co. v. Metzler,* 586 N.E.2d 897, 900 (Ind.App.1992); accord, *State Farm Fire & Cas. Co. v. T.B.,* 728 N.E.2d 919, 923-24 (Ind.App.2000).

Where the interests of the insurer and insured conflict, however, Indiana courts have recognized some limits on the use of collateral estoppel against the insurer. See *Metzler,* 586 N.E.2d at 901 (collateral estoppel may not apply to issues affecting coverage where insurer either defends insured under reservation of rights or files declaratory judgment action on coverage); *State Farm Mutual Automobile Ins. Co. v. Glasgow,* 478 N.E.2d 918, 923 (Ind.App. 1985) (same); *Snodgrass v. Baize,* 405 N.E.2d 48, 51 (Ind.App.1980) (stating gen-

eral rule but recognizing exception for issues as to which interests conflict).

In *Frankenmuth Mutual Ins. Co. v. Williams*, 690 N.E.2d 675, 679 (Ind.1997), the Supreme Court of Indiana confirmed these general principles. In *Frankenmuth* the coverage question was whether one or both of the insureds had acted negligently (so the loss in question would be covered) or intentionally (so the loss would not be covered). The insurer had refused to defend its insured in the tort lawsuit, believing that the insured must have acted intentionally in causing the injury. However, the insurer had not filed a declaratory judgment action. One insured then entered into a consent judgment with the tort claimants in which she admitted that she had acted negligently. The tort claimants agreed not to execute the judgment against the insured's personal assets. They filed a proceeding supplemental to recover the consent judgment from the insurer.

The insurer wanted to litigate whether the insured's conduct had been negligent or intentional. The Supreme Court of Indiana held, however, that the insurer was estopped from raising any defense under the policy's intentional acts exclusion. The court treated the consent judgment as a "final legal conclusion" that the insured had acted negligently, and found that "the time has passed" for the insurer to argue that the insured's negligence was not a proximate cause of the tort claimant's injuries. *Id.* at 678–79. The court held that the insurer had forfeited its right to litigate the negligent v. intentional issue by failing either to defend the insured under a reservation of rights or to clarify its obligation through a declaratory judgment action. *Id.* at 679. The court explained: "As the Court of Appeals observed in *Liberty Mutual* [*v. Metzler* ], an insurer may 're-

fuse to defend or clarify its obligation by means of a declaratory judgment action,' but 'it does so at its peril.'" *Id.*, quoting 586 N.E.2d at 902.

These Indiana cases differ from this one in two important respects. First, unlike the insurers in *Frankenmuth, Metzler,* and *Glasgow,* Midwestern took affirmative steps to clarify its obligations by filing this declaratory judgment action. Second, the disputes in *Frankenmuth, Metzler,* and *Glasgow* dealt with the issue of covered negligent conduct v. non-covered intentional conduct. That is, the coverage disputes in those cases depended on resolution of factual disputes at the heart of the underlying tort lawsuits themselves. In this case, by contrast, the factual issues that will determine coverage have nothing to do with the specifics of the fatal fire itself or with the Skaggs' damages.

What protection does the insurer gain by filing a declaratory judgment action, as Midwestern did here? *Frankenmuth, Metzler,* and *Glasgow* clearly imply that an insurer who files a declaratory judgment action may retain the ability to litigate those issues that affect its coverage. None of those cases suggests, however, that filing a declaratory judgment action leaves the insurer free to litigate (or relitigate) the issues of its insured's liability or the amount of damages. In dealing with "conflicts of interest" between an insured and insurer that preclude application of collateral estoppel, the Indiana cases have not referred to all disagreements between insurer and insured. Rather, these cases have referred only to issues relevant to both the insured's liability and the insurer's duty of coverage, such as negligent v. intentional conduct.[2]

Despite these differences, however, the Indiana cases offer some guidance here.

**2.** Defendants have argued that the Indiana court's opinion in *Frankenmuth* shows that an insurance company that files a declaratory judgment action does so "at its peril." The argument is based on a clear misreading of the opinion. The Supreme Court of Indiana wrote: "As the Court of Appeals observed in *Liberty Mutual* [*v. Metzler* ], an insurer may

'refuse to defend or clarify its obligation by means of a declaratory judgment action,' but 'it does so at its peril.'" 690 N.E.2d at 679, quoting 586 N.E.2d at 902. The court clearly meant that if the insurer refuses *either* to defend its insured *or* to clarify its obligation in a declaratory judgment action, it does so "at its peril." That is also the plain meaning of

They are generally consistent with the approach to this problem taken in the Restatement (Second) of Judgments, and they are consistent with the majority of courts in other states. Those courts hold that where an insurer has defended under a reservation of rights or has filed a declaratory judgment action, a consent judgment between an insured and a tort plaintiff will bind the insurer as to issues not related to coverage, at least so long as the insured has acted reasonably and in good faith.

The Restatement (Second) of Judgments addresses in Section 57 the effect on an indemnitor of a judgment against an indemnitee:

(1) Except as stated in Subsection (2), when one person (the indemnitor) has an obligation to indemnify another (the indemnitee) for a liability of the indemnitee to a third person, and an action is brought by the injured person against the indemnitee and the indemnitor is given reasonable notice of the action and an opportunity to assume or participate in its defense, a judgment for the injured person has the following effects on the indemnitor in a subsequent action by the indemnitee for indemnification:

(a) *The indemnitor is estopped from disputing the existence and extent of the indemnitee's liability to the injured person;* and

(b) The indemnitor is precluded from relitigating issues determined in the action against the indemnitee if:

(i) the indemnitor defended the action against the indemnitee; or

(ii) the indemnitee defended the action with due diligence and reasonable prudence.

(2) If there is a conflict of interest between the indemnitee and the indemnitor regarding the injured person's claim against the indemnitee, so that the indemnitor could not properly have assumed the defense of the indemnitee, a judgment for the injured person precludes the indemnitor only with respect to issues determined in that action as to which:

(a) there was no conflict of interest between the indemnitee and the indemnitor; and

(b) the indemnitee conducted a defense with due diligence and reasonable prudence.

(3) A "conflict of interest" for purposes of this Section exists when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the scope of the indemnitor's obligation to indemnify and another of which is not.

Restatement (Second) of Judgments § 57 (1980) (emphasis added).

The dispute over coverage between Midwestern and the Cossell Group does not amount to a "conflict of interest" within the terms of § 57(3). This is not a case where the injured persons' claims against the Cossell Group could be sustained on different grounds, one of which would be within the scope of coverage and the other would not. Section 57(1) therefore applies to the case here because its other conditions were met. Midwestern certainly had notice of the Skaggs' action against the Cossell Group and had an opportunity to assume or participate in the defense. A judgment therefore estops the insurer from disputing "the existence and extent of the indemnitee's ' liability to the injured person." § 57(1)(a).[3]

---

*Metzler,* which was quoted, and *Glasgow,* which was followed in *Metzler.*

**3.** Even if the disagreement between Midwestern and the Cossell Group on coverage were deemed a conflict of interest for these purposes, Midwestern would still be bound on the issues of liability and damages (there was no conflict of interest on those issues), so long as the Cossell Group conducted a defense with due diligence and reasonable prudence. As explained below, it did so.

Decisions by the Supreme Court of Minnesota and the Supreme Court of Arizona have approached the issue presented here in a manner similar to that of the Restatement (Second) of Judgments. Those decisions have given thoughtful consideration to the issue on facts similar to those presented here, in which the insurers sought declaratory relief as to coverage. Those courts' views are consistent with Indiana law and policy on related issues, and they reflect the majority view among the states.[4]

The Minnesota case is *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982). Plaintiff Miller had been injured in a car accident involving a car owned by the insured. The insurer argued that it had no duty to provide insurance coverage because the insured had not been driving the car at the time of the accident. To determine the coverage question, the insurer filed a declaratory judgment action. The insurer also paid for separate counsel to defend its insured and the driver of the car in the tort litigation. The court in the declaratory judgment action found that the insurer had a duty to provide coverage to both the owner and the driver of the car. A few weeks later, the injured Miller filed her personal injury action against the driver and owner of the car. The insurer then appealed the decision in the declaratory judgment action. *Id.* at 731–32.

Before a ruling was issued on appeal, Miller negotiated a settlement with the insured and the driver of the car. The insurer had been invited to participate in the negotiations but had refused. The parties entered into a stipulated judgment that provided it could be collected only from proceeds of any applicable insurance, with no personal liability to defendants. *Id.* at 732. Miller then sued to garnish the insurance policy pursuant to the stipulated judgment. The insurer argued that it had no duty to satisfy the judgment because the insureds had breached their duty un-

der the insurance policy to cooperate with the insurer. *Id.* The trial court entered summary judgment for Miller on this issue, and the Supreme Court of Minnesota affirmed, ordering enforcement of the stipulated judgment against the insurer.

The court recognized that the insurer "had a right to determine if its policy afforded coverage for the accident claim" and that the insurer had avoided a conflict of interest by "bringing a declaratory judgment action on the coverage issue prior to trial" and "appropriately providing another set of attorneys to defend the insureds in the declaratory judgment action." *Id.* at 733. The court also noted that, although the insurer "did not abandon its insureds neither did it accept responsibility for the insureds' liability exposure." *Id.* In light of these facts, the court stated the issue in terms that apply here: "What we have, then, is a question of how should the respective rights and duties of the parties to an insurance contract be enforced during the time period that application of the insurance contract itself is being questioned." *Id.*

The Minnesota court concluded that the insureds did not breach their duty to cooperate with the insurer by settling directly with the tort claimant. *Id.* at 734. The court reasoned:

> If as here, the insureds are offered a settlement that effectively relieves them of any personal liability, at a time when their insurance coverage is in doubt, surely it cannot be said that it is not in their best interests to accept the offer. Nor, do we think, can the insurer who is disputing coverage compel the insureds to forego a settlement which is in their best interests.

*Id.* at 733–34.

The court also recognized that when an insured enters into a stipulated judgment with a tort claimant without the consent of

---

4. See generally Justin A. Harris, Note, *Judicial Approaches to Stipulated Judgments, Assignment of Rights, and Covenants Not to Execute in Insurance Litigation,* 47 Drake L. Rev. 853, 856-57 (1999); Chris Wood, Note, *Assignments of Rights and Covenants Not to Execute,* 75 Tex.L.Rev. 1373 (1997).

its insurer, there is a risk that the stipulated judgment could be the product of fraud or collusion. Under the facts presented, however, the court found as a matter of law that the stipulated judgment was not obtained by fraud or collusion. *Id.* at 734. The court specifically rejected the argument that a stipulated judgment is fraudulent or collusive as a matter of law when the stipulation is contrary to the insurer's interest, entered into over the objection of the insurer, and for an amount that is twice the amount of the insured's policy limits. *Id.* Reaffirming that the "insureds had a right to make a settlement relieving them of liability," the court noted that the insureds had notified the insurer that they were participating in settlement negotiations. Additionally, the insureds did not settle with the tort claimant until after the court in the declaratory judgment action had determined that coverage existed. *Id.*

The Minnesota court also recognized that an insurer is placed in a "no-win" situation when its insured negotiates with a tort claimant while the issue of coverage is still pending:

> If the insurer ignores the "invitation" to participate in the settlement negotiations, it may run the risk of being required to pay, even within its policy limits, an inflated judgment. On the other hand, if the insurer decides to participate in the settlement discussions, ordinarily it can hardly do so meaningfully without abandoning its policy defense. *Nevertheless, its seems to us, if a risk is to be borne, it is better to have the insurer who makes the decision to contest coverage bear the risk.* Of course, the insurer escapes the risk if it should be successful on the coverage issue, and, in that event, it is plaintiff who loses.

*Id.* (emphasis added). Perhaps because of the insurer's "no-win" situation, the court also held that a tort claimant has the burden "to show that the settlement is reasonable and prudent." *Id.* at 735. A settlement is reasonable and prudent if "a reasonably prudent person in the position of the defendant would have settled for [that

amount] on the merits of plaintiff's claim." *Id.* The court then found that the trial court had not erred in granting summary judgment to the tort claimant in the amount of $50,000, thus enforcing the stipulated judgment against the insurer after coverage had been established. *Id.*

The Supreme Court of Arizona considered similar issues in *United Services Automobile Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987). In that case, an insurer had agreed to defend its insureds in a tort lawsuit under a reservation of rights. Without the consent of the insurer, the insureds entered into a settlement agreement with the tort claimant. The agreement included a covenant not to execute against the insureds' personal assets. The liability insurer then filed a declaratory judgment action seeking a declaration that it was not obligated to satisfy the settlement agreement because the insureds' action fell outside the policy's coverage and because the insureds had breached the insurance policy's cooperation clause.

The Arizona court recognized the conflicting interests involved when an insurer disputes coverage for an insured while the insured is a defendant in a tort action. The court acknowledged that the insurer's reservation of rights placed the insureds in a "precarious position." *Id.* at 251. If the insureds had gone to trial, they faced the possibility of a large jury verdict that might not be covered by their insurance policy. The court therefore recognized "that the insureds had the need to act reasonably to protect themselves from 'the sharp thrust of personal liability.'" *Id.,* quoting *Arizona Property & Cas. Ins. Guar. Fund v. Helme,* 153 Ariz. 129, 735 P.2d 451, 459 (1987).

On the other hand, the court also noted the risks an insurer faces when its insured enters into a settlement agreement without the insurer's participation. "Insureds' settlements often are motivated solely by their strongly-felt need for economic survival and the claimant's desire for a quick judgment that will enable him to get after

what he perceives as the real business--collecting from the insurer." *Id.* at 252. The court recognized, however, that insurers often expose themselves to such risks by raising the issue of coverage. "By raising the coverage defense, even in good faith, the insurer places the insured in a position where settlement may be necessary for his own protection rather than from a lack of cooperation with the insurer." *Id.* The court balanced these competing concerns by finding that an insured who is being defended under a reservation of rights can enter into a settlement agreement without breaching a cooperation clause.

The Arizona court then turned to the insurer's claim that it should be permitted to " 'relitigate' any aspect of the original tort claim." *Id.* at 253. Assuming that there was coverage, the insurer argued, as Midwestern does here, that it had "an absolute right to relitigate all aspects of the liability case, including liability and the amount of damages." *Id.* The court rejected this position. The insurer's "absolute position would destroy the purpose served by allowing insureds to enter into [settlement] agreements because claimants would never settle with insureds if they never could receive any benefit." *Id.*

Like the Supreme Court of Minnesota in *Miller*, the Arizona court noted that an insurer faced the risk that its insured may settle for an "inflated amount" or concede "to a frivolous case merely to escape exposure or further annoyance." *Id.* Thus, the court found "that neither the fact nor amount of liability to the claimant is binding on the insurer unless the insured or claimant can show that the settlement was reasonable and prudent." *Id.* at 254, citing *Miller*, 316 N.W.2d at 735. The court then remanded the case for a determination as to whether the insurer had to provide coverage and, if so, whether the consent judgment was reasonable.

Courts in many states have followed the reasoning of both *Miller* and *Morris*. They have held that when an insured and tort claimant enter into an agreed judgment and a covenant not to execute the judgment against the insured, the judgment can be enforced against the insurer if coverage is shown. Different states have taken two principal approaches to the burden of proof on the closely related issues of bad faith, collusion, and the reasonableness of the consent judgment. Some courts have held that the claimant has the burden of showing by a preponderance of the evidence that the amount of the judgment was reasonable and prudent. See, *e.g.*, *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 534 (Iowa 1995); *Fisher v. American Family Mutual Ins. Co.*, 579 N.W.2d 599, 607 (N.D.1998). Other courts have determined that an insured should have only the initial burden of producing evidence that the settlement is "prima facie reasonable in amount and untainted by bad faith;" if the insured satisfies this burden of production, then the insurer has the "burden of demonstrating, by a preponderance of the evidence, that it is not liable because the settlement is neither reasonable nor reached in good faith." *Griggs v. Bertram*, 88 N.J. 347, 443 A.2d 163, 173-74 (1982); accord, *e.g.*, *Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79, 92-93 (1990) (adopting the New Jersey rule as stated in *Griggs* ); *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla.App.1984) (same).

The Supreme Court of Texas has taken a much more restrictive approach to the issues presented by consent judgments containing an assignment of rights and a covenant not to execute. The Texas court has held that under specific circumstances, an insured's assignment of his claims against his insurer to a tort claimant is invalid. *State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex.1996). Concerned about the difficulty of evaluating a tort claimant's claim against an insured when a settlement is reached before the claim has actually been adjudicated, the Texas court found that an insured's assignment of his rights against his insurer to a claimant is simply invalid if: (1) the assignment was made prior to an adjudication of

the claimant's lawsuit against the insured in a fully adversarial trial; (2) the insurer has tendered a defense; and (3) either (a) the insurer has accepted coverage or (b) the insurer has made a good faith effort to adjudicate coverage issues prior to adjudication of the claimant's lawsuit. *Id.* at 714. The court also found that a judgment for the claimant against the insured, rendered without a fully adversarial trial, was not binding on the insurer or admissible as evidence of damages in an action against the insurer by the claimant as the insured's assignee. *Id.*

█ After considering the Indiana decisions and those around the country, this court predicts that the Indiana courts would reject the Texas approach in *Gandy* and would instead follow the majority path reflected by § 57 of the Restatement (Second) of Judgments, the Minnesota court in *Miller v. Shugart,* and the Arizona court in *Morris.*

The Indiana decisions in *Frankenmuth, Metzler,* and *Glasgow,* discussed above, all recognized that consent judgments with covenants not to execute could be imposed on an insurer even where there had been no trial on the underlying claim. All three cases involved insurers who had neither defended under a reservation of rights nor sought a declaratory judgment, as Midwestern did here. Nevertheless, nothing in those Indiana opinions suggests that merely filing a declaratory judgment action lets an insurer who has breached its contract retain the right to relitigate all issues of liability and damages.

Such a rule would encourage denial of coverage and multiply litigation. The Texas approach essentially forces the abandoned insured (recall that all these cases assume the insurer has wrongfully denied coverage and often a defense as well) either to pay out of her own pocket for the costs of defense up through a full trial, or to wait until coverage issues have been resolved definitively by the courts. In ei-

ther scenario, the abandoned insured is likely to be stuck for years in expensive litigation as a result of the insurer's breach of the insurance contract. The Texas approach denies the insured any earlier escape by settlement, and it does so in order to protect the insurer who, by definition in these cases, has breached that contract. That is not a policy the Indiana courts are likely to embrace, especially in view of the Indiana courts' recognition of the needs of the insured and injured plaintiffs when the insured has been abandoned by its insurer.[5]

In addition, the Indiana courts are likely to view the Texas approach as unduly rigid in its effort to protect the insurer from bad faith or collusion. A more direct approach to that issue would suffice to protect the breaching insurer from outrageous efforts to overreach, while still encouraging and allowing settlement of disputes between the abandoned insured and injured plaintiffs.

Thus, this court believes the Indiana courts would adopt an approach to this case in which the consent judgment with a covenant not to execute would bind the insurer on issues of its insured's liability and the extent of the injured parties' damages, so long as (1) the coverage is eventually shown, and so long as the consent judgment (2) is not the product of bad faith or collusion and (3) falls somewhere within a broad range of reasonable resolutions of the underlying dispute. As explained below, this court need not predict precisely which approach Indiana would take to burdens of production and proof on the issues of bad faith, collusion, and reasonableness. The result on the evidence in this record would be the same under any of those approaches.

### B. *Bad Faith, Collusion, or an Unreasonable Settlement*

Midwestern has asserted as an affirmative defense that it has no duty to pay the

---

**5.** Midwestern would not even qualify for the protection the Texas court provided the insurer in *Gandy,* however, because Midwestern

did not provide a defense to its (putative) insureds.

consent judgment because the judgment was a product of fraud, collusion, and/or bad faith. Midwestern has moved for summary judgment on this defense, contending that the agreed judgment must have been the result of fraud, collusion, or bad faith because the Cossell Group gave up a winning statute of limitations defense by agreeing to a consent judgment for $1.6 million, but requiring the Cossell Group to pay only $300,000 cash, with a covenant by the Skaggs not to execute on personal assets for any of the remaining amount.

In response, the Cossell Group and the Skaggs family have also moved for summary judgment on the issue of this defense. They contend there is no evidence that would allow a reasonable trier of fact to conclude that the agreed judgment was the product of bad faith, collusion, or fraud. They also argue that there was considerable uncertainty about the statute of limitations defense at the time of the settlement.

The cases do not distinguish precisely between fraud, bad faith, and collusion in this context, and the court has abbreviated the formula to "bad faith or collusion." There is no evidence here that defendants concealed anything from Midwestern or misled it about any matters.

Closely related to the issue of bad faith or collusion, of course, is the question whether the consent judgment was a "reasonable" settlement of the dispute between the Skaggs and the defendants in the tort lawsuit. The issues are closely related because evidence of deliberate concealment or misrepresentations, or of explicit, knowing agreements between insured and injured parties to impose outrageous terms on an insurer is rare. Insurers who challenge so-called "sweetheart deals" ordinarily rely on indirect evidence of bad faith and collusion. They argue simply that the agreement is so unreasonable in its terms that it must have been the product of bad faith or collusion.

As stated above, this court believes the Indiana courts would be willing to relieve a breaching insurer from the terms of a consent judgment that simply could not be deemed a reasonable resolution of the underlying lawsuit. However, the Indiana standard of reasonableness would be a generous one, allowing for a very broad range of reasonable resolutions. It would take into account factors that include uncertainty of fact and law, especially before trial, the fact that different parties have different degrees of risk aversion, the burdens of litigation on the abandoned insured, including expense and disruption of life and business, and the wide ranges of damage awards where the decisions are not subject to precise quantification. The standard of reasonableness would also allow the negotiating parties to make honest but perhaps mistaken judgments about the risks they face. See generally *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65, 87 (1997) (factors in evaluating reasonableness of settlement by abandoned insured include the releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released); *S.G. v. St. Paul Fire & Marine Ins. Co.*, 460 N.W.2d 639, 644-45 (Minn. App.1990) (holding settlement agreement was reasonable as a matter of law where insured's potential liability far exceeded settlement amount and no other evidence indicated it was unreasonable).

Indiana courts would not treat a challenge to the reasonableness of a consent judgment as an opportunity to relitigate issues based merely on 20/20 hindsight or intervening changes in the law, nor because the insurer believes that if it had been directing the defense (*i.e.*, if it had not breached its insurance contract), it could have gotten a better deal. See generally *D.E.M. v. Allickson*, 555 N.W.2d 596, 603 (N.D.1996) (settlement agreement was

reasonable even though a later change in state law might have precluded a finding of liability against insured; an insured's "failure to predict future appellate court rulings of other states certainly has no bearing on the reasonableness of the settlement"); *Singleton v. United Tugs, Inc.*, 710 So.2d 347, 351 (La.App.1998) (rejecting challenge to reasonableness of settlement; court would not allow the insurer "the benefit of urging that there has been a settlement by parties who may otherwise not be liable as a result of trial," as insurer did not participate in the defense of the tort lawsuit or contribute to settlement of the matter).

In dealing with analogous problems, Indiana courts have acknowledged the difficulty that can arise in evaluating the merits of a tort claim and whether an insurance policy provides coverage for the claim. For example, the Supreme Court of Indiana took this difficulty into account when it recognized but also limited a cause of action for breach of an insurer's duty to deal with its insured in good faith:

> We also note that this new cause of action does not arise every time an insurance claim is erroneously denied. For example, a good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the ground for a recovery in tort for the breach of the obligation to exercise good faith. This is so even if it is ultimately determined that the insurer breached its contract.

*Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 520 (Ind.1993). Thus, just as Indiana law allows an insurer reasonably, yet erroneously, to deny an insured's valid claim for coverage, this court believes that Indiana courts would uphold a settlement agreement reflecting an insured's reasoned but arguably mistaken evaluation of a tort claim brought against him.

With this principle in mind, the court believes the Supreme Court of Indiana would instruct trial courts to resolve a challenge to the reasonableness of a consent judgment with a covenant not to execute by viewing the judgment from the standpoint of the insured at the time of the agreement, keeping in sharp focus the premise that the insurer breached its contract and left the insured hanging, exposed to the serious risk of devastating personal liability. See *Miller*, 316 N.W.2d at 735 ("The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim. This involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial.").

The court also believes the Supreme Court of Indiana would apply a generous standard of reasonableness to cases of this type, leaving the issue to be decided as a matter of law unless there were clear grounds for finding the settlement fell outside any reasonable bounds for valuing the underlying dispute. Courts often say that reasonableness is a question of fact, of course, but special considerations in this situation would lead the Indiana courts to set a high bar for an insurer challenging a settlement reached by its insured after it has wrongfully abandoned that insured.

A trial on the reasonableness of a settlement would effectively amount to a complex trial within a trial. At the core would be the evidence on the underlying claims--the evidence of liability, injury, and damages--in other words, a trial closely akin to the trial both the insured and the injured parties sought to avoid by entering into the settlement in the first place. (A court would presumably exclude or limit the relevance of evidence discovered or legal arguments first raised after the settlement was reached.) Layered over that trial of the core events, however, would be evidence about how the underlying litigation proceeded, about the course of the settlement negotiations (both objectively and from the subjective views of the participants), and about the factors that led the parties to agree on the terms they

reached. That evidence, moreover, would invite a further layer of evidence in the form of opinions from lawyers, claims adjusters, and perhaps mediators and judges, expressing their views on the reasonableness of the settlement terms. In this case, one can easily imagine, for example, the rather sterile exercise of lawyers or legal scholars testifying as expert witnesses to persuade the jury on their differing views on the apparent strength of the Cossell Group's statute of limitations defense in the interim after the Indiana Court of Appeals decision, but before the Supreme Court of Indiana decision, in the *Schuman* case discussed below.

Such daunting prospects have led the Minnesota court that decided *Miller v. Shugart* to hold that such issues of reasonableness should be tried only to a court, not to a jury. See *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990). The Indiana courts are not likely to adopt that approach of taking such an issue away from a jury where it is genuinely disputed, but they would set a high bar before allowing an insurer who, by definition, has breached its duty to its insured, to impose such a trial on the parties who thought they had settled their dispute.

Midwestern has presented no direct evidence of bad faith or collusion, relying instead on the argument that the agreement between the Cossell Group and the Skaggs family was unreasonably excessive to support an inference of bad faith or collusion. The court therefore must consider the information available to the Cossell Group at the time it decided to settle with the Skaggs. The parties in this action have submitted in the record here evidence relevant to the Cossell Group's decision with respect to the statute of limitations defense, damages, and its own liability for the Skaggs' losses.

### 1. The Statute of Limitations Defense

In settling with the Skaggs family, the Cossell Group obviously gave up any defenses it might have had, including the statute of limitations. The settlement agreement included an explicit waiver of any statute of limitations defense. Def. Ex. 2. Midwestern contends that the waiver of this "absolute defense" is enough by itself to prove bad faith or collusion as a matter of law. Midwestern relies on the Supreme Court of Indiana's decision in *Schuman v. Kobets*, 716 N.E.2d 355, 356 (Ind.1999), in which the court found that bodily injury claims, even if characterized as claims for breach of the implied warranty of habitability in a residential lease, are governed by the Indiana two-year statute of limitations rather than the six-year statute for claims for breach of an implied warranty of habitability.

As a general rule, the court agrees that where an insured simply surrendered an obviously winning defense to all liability, that surrender would be evidence of bad faith or collusion and could permit a finding of unreasonableness as a matter of law, especially when linked to a covenant not to execute. However, the undisputed evidence shows that in December 1998, the Cossell Group's statute of limitations defense appeared far from "absolute." The parties in the tort lawsuit had vigorously contested the issue. The Cossell Group first raised the issue on November 1, 1995, when it moved to dismiss the Skaggs' complaint in Marion Superior Court. Def. Resp. Ex. 3 at 16. On February 27, 1996, that court denied the Cossell Group's motion. Def. Resp. Ex. 9.

On August 21, 1998, the Indiana Court of Appeals issued its opinion in *Schuman v. Kobets*, 698 N.E.2d 375 (Ind.App.1998), which rejected a plaintiff's claim that the six-year statute of limitations applied to her claim for personal injuries arising out of a breach of an oral lease contract and/or an implied warranty of habitability. The court focused on the nature of the harm suffered by the plaintiff, which was injury to her person. The court applied the two-year statute of limitations for personal injury actions, even though the plaintiff had framed the action as one for breach of an oral contract/implied warranty of habitability. *Schuman*, 698 N.E.2d at 378.

The Cossell Group then filed on November 13, 1998, a new motion for judgment on the pleadings arguing that the Skaggs' claims were untimely under the rule just announced in *Schuman*. See Pl. Ex. B. On November 25, 1998, the Skaggs responded to the motion. They argued that their claims arose solely out of an oral lease contract and were therefore governed by the six-year statute of limitation. See Def. Resp. Ex. 3. The Skaggs pointed out that a transfer petition was pending in *Schuman*. They argued that the Court of Appeals decision was "an erroneous decision and bad law" because it was "directly contrary" to the Supreme Court of Indiana's holdings in other cases. *Id.* at 15, citing *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 246-47 (Ind.1992), *Insul-Mark Midwest v. Modern Materials*, 612 N.E.2d 550, 556-57 (Ind.1993), and *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1248-49 (Ind. App.1998). These decisions certainly lent substantial support to the Skaggs' argument that the Court of Appeals had erred in *Schuman* and that, where the parties had a contractual relationship, the contract statute of limitations would govern despite an argument that personal injuries sounding in tort were alleged.

In December 1998, before the Marion Superior Court ruled on the Cossell Group's new motion, the parties reached their settlement. At the time of the settlement, a petition to transfer the *Schuman* decision to the Supreme Court had been filed but not yet granted. See *Schuman v. Kobets*, 714 N.E.2d 163 (Ind. Jan.11, 1999) (granting transfer and vacating appellate decision and opinion).

In light of this sequence of events, Midwestern cannot rely on the Supreme Court of Indiana's September 15, 1999, decision in *Schuman* to support its contention that the Cossell Group gave up an "absolute defense" in its settlement with the Skaggs in December 1998. The evidence shows that at the time of the settlement, the law regarding the applicable statute of limitations for claims arising from a breach of an oral contract and the warranty of habitability was uncertain.

The undisputed facts show that it was not unreasonable for the Cossell Group or its lawyers not to predict with a high degree of certainty that the Supreme Court of Indiana would affirm the appellate decision in *Schuman*. As reflected in the appellate court's divided views in *Wells v. Stone City Bank*, 691 N.E.2d 1246, the issue was fairly debatable. The Cossell Group could reasonably be worried that the Supreme Court of Indiana might follow the approach of the majority in *Wells* rather than in *Schuman*.[6]

When the Cossell Group decided to settle with the Skaggs, neither side knew what the Supreme Court of Indiana would do with the statute of limitations issue. For both sides, the risks of a wrong prediction were enormous. The principals of the Cossell Group faced the prospect of personal liability in the range of millions of dollars. The Skaggs family faced the prospect of a complete loss on an otherwise strong case on liability and damages. Such large risks

6. In addition, as any law student learns quickly, and as any experienced practitioner learns to feel in her bones, it is possible for a court to decide to depart from prior precedent and to chart a new course in the law even when that particular area of the law has seemed settled. See, *e.g.*, *Benton v. City of Oakland City*, 721 N.E.2d 224 (Ind.1999) (rewriting law of public and private duties in tort claims against state and local governments); *Kimberlin v. DeLong*, 637 N.E.2d 121 (Ind.1994) (established precedents had held that a tort victim's subsequent suicide insulated tortfeasor from liability for wrongful death, but court recognized new exception if tort was intentional and was a substantial factor in suicide); *Barnes v. Barnes*, 603 N.E.2d 1337 (Ind.1992) (established precedents gave parents immunity in personal injury actions by minor children against their parents, but court recognized new exception when action is based on claim of intentional felonious conduct). Moreover, legal realists recognize that such departures from precedent are often more likely to occur in cases with especially compelling facts. The Cossell Group could reasonably fear that prospect in this case.

often lead parties to settle cases. The court therefore cannot agree with Midwestern's contention that the Cossell Group gave up an "absolute defense" when it waived any defense based on the statute of limitations. The Cossell Group's decision to settle before the statute of limitations defense was resolved simply cannot support a finding that the settlement agreement was a product of bad faith or collusion or was unreasonable.

### 2. Liability, the Amount of Damages, and Settlement Negotiations

Midwestern also argues that the consent judgment was a product of bad faith or collusion and was unreasonable because there was no "rational, principled basis" for the Cossell Group to agree to a total damages award of $1.6 million. Again, Midwestern offers no direct evidence that the settlement agreement was a product of bad faith or collusion. It essentially is asking this court to infer bad faith or collusion from the terms of and circumstances surrounding the settlement. In essence, the issue is whether, under all the circumstances, the settlement amount of $1.6 million, with $300,000 paid by the general partners of Cossell Group and a covenant not to execute on anything other than a Midwestern insurance policy for the rest, was so unreasonable as to permit an inference of collusion or bad faith. The court must consider the evidence regarding the nature and extent of the Skaggs' alleged injuries, as well as the alleged wrongful conduct of the defendants in the state tort case.

At bottom, this is a case about a horrible trailer fire that claimed the life of a five year old girl, and injured her mother, younger sister, and stepfather. If the Skaggs' case against the Cossell Group had gone to trial, the Skaggs would have presented evidence that the fire began in the front room of the Skaggs' family trailer and that Patrick Skaggs became aware of the fire when he was awakened by two year old Patricia. He smelled smoke and proceeded to the front of the trailer, where he saw flames and sparks coming from a wall socket by the front door of the trailer. He picked up Amber who had been asleep on the couch and rushed back to the bedroom.

Patrick Skaggs tried to kick open the back door of the trailer. Tragically, it would not open because it had been chained and wired shut from the outside, apparently by the Cossell Group's property manager. Patrick then ran back to the front of the trailer where he attempted to put out the fire, but was unsuccessful. When he opened the front door to try to get the family out of the trailer that way, the entire front room went up in flames. Patrick went through the flames, suffering burns as a result, and got outside. He then went around to the side of the trailer where he broke out a bedroom window. Patrick pulled little Patricia out through the window. Lorrie reached for Amber but could not find her. The room was full of smoke. Lorrie struggled to find Amber but still could not find her. Patrick eventually pulled Lorrie out through the window. Patrick tried several times to re-enter the trailer to find Amber. He was also unable to do so because of the intense smoke and flames. See Supp. Invest. Report; Deputy Coroner Field Report; Def. Ex. 3. Because of his efforts, Patrick sustained thermal burns over 3.5 percent of his body, which have resulted in daily pain, scarring, and a 10 percent permanent partial impairment rating. See Def. Resp. Exs. 7(K), 7(L).

Firefighters then arrived and tried to pry open the back door of the trailer. Approximately three minutes after entering the burning trailer, they located Amber in a bedroom in the rear of the trailer. They found her just a few feet from the chained and wired back door, hiding under a bed and clutching a Raggedy Ann pillowcase. She was not breathing. The firefighters brought her blackened and lifeless body out of the trailer and immediately began attempts to resuscitate her. She was then transported to the hospital by ambulance. Doctors at the hospital were able to resuscitate her and she was placed on a

ventilator. It was estimated, however, that Amber had gone without oxygen to her brain for 45 minutes. Her pupils were fixed and dilated. Doctors determined that Amber had suffered second and third degree thermal burns over 46 to 50 percent of her body and had significant smoke inhalation injuries.

The next morning, Amber's cerebral function was still zero. After discussing the options with Amber's treating physicians, Lorrie and Patrick Skaggs made the difficult decision to take Amber off of life support. Amber was pronounced dead a short time later. Def. Resp. Ex. 7(H).

If this case had proceeded to trial, the Skaggs would have presented these facts by oral testimony from Patrick and Lorrie Skaggs and others, including firefighters, emergency medical personnel, and the doctors at Methodist Hospital. The court does not mean to suggest here that every detail of this account of the fire or the Skaggs' injuries is beyond reasonable dispute here or in a trial of their underlying claims. The evidence before this court shows beyond reasonable dispute, however, that the Skaggs family would have presented substantial evidence to support this account. For purposes of evaluating the reasonableness of the Cossell Group's decision to settle, that ability to support the account is the material fact.

Additionally, in making the decision to settle, the Cossell Group knew the jury also likely would have viewed two kinds of probative and very powerful visual evidence: a fire department videotape of the fire, and photographs of Amber when she was at the hospital and autopsy photographs of her body. These items are part of the record here as Defendants' Response Exhibits 8, 7(F), and 7(G).

The fire department videotape begins as the fire truck is en route to the fire. The videotape shows the entire front of the trailer engulfed in flames when the fire truck arrived on the scene. The videotape has sound. A viewer can hear people screaming that a child is trapped inside the burning trailer. The videotape shows firefighters working to enter the back of the trailer. After a short period of time, a firefighter emerges from the back of the trailer carrying Amber's blackened and lifeless body. As firefighters and medical personnel work feverishly to resuscitate her, Lorrie Skaggs can be heard hysterically screaming Amber's name and begging Amber to "please hold on for Mommy." Amber is then placed in an ambulance for transport to the hospital.

The photographs of Amber when she was at the hospital show Amber lying on her back with numerous tubes hooked up to her blackened and burned body. Her once blond hair is black from soot, and a black liquid is seeping from her nose. The autopsy photographs graphically depict the severe burns on Amber's body.

Defendants have also submitted a videotape of Patrick and Lorrie Skaggs that was part of a settlement presentation the Skaggs gave to the Cossell Group. Patrick and Lorrie discuss on the tape their memories of Amber as a young child and the effects the fire had on their lives. See Def. Resp. Ex. 9. The videotape is a good indication of what Patrick and Lorrie Skaggs likely would have said if they had been called to testify at trial on the issue of damages. Patrick describes his attempts to rescue Amber from the burning trailer and shares his frustration at not being able to reach her. He also describes the pain he continues to suffer from as a result of the burns to his feet and how the pain makes it difficult for him to work. Lorrie Skaggs describes her overwhelming grief at losing Amber and how difficult it was to make the decision to take Amber off of life support. She also relates how Patricia suffered from nightmares after the fire and is still terrified to be near an open flame.

In addition to their physical and emotional injuries, the Skaggs family lost nearly all their clothes and other possessions in the fire, including their car and the family pets. The Skaggs estimate that they lost approximately $5,500 in personal property. Def. Ex. 3; Def. Resp. Ex. 7(N). Their

medical bills were approximately $8,000, and Amber's funeral and burial expenses were approximately $2,000. Def. Resp. Exs. 7(M), 7(N).

Regarding the wrongful conduct of the Cossell Group, the Skaggs likely would have produced evidence at trial of various health and safety violations at the Shady Pines mobile home park. At the time of the fire, there was no smoke alarm in the Skaggs' trailer. Also, as noted, the back door, which arguably offered the best escape route from the fire, had been chained and wired shut from the outside by Cossell Group's property manager. Patrick Skaggs had complained to defendants Kearns and Lloyd about an electrical outlet next to the front door that was not working. Although the outlet was later repaired, it was the outlet where the fire started. From 1985 up to the time of the fire, Shady Pines had been cited many times by the Marion County Health Department for violations of health and safety regulations. The violations included having trailers with back doors that would not open, smoke detectors that did not work, and electrical hazards. See Def. Ex. 3; Def. Resp. Ex. 3.

The Cossell Group had ample reason to fear the verdict of jurors who would have watched a videotape of a fireman carrying a lifeless Amber from the fire while her mother is screaming in the background, who would have viewed graphic pictures of Amber's badly burned body, and who would have learned of these health and safety violations at Shady Pines, especially in light of the fact that firefighters found Amber a few feet away from the locked back door of the Skaggs' trailer that Patrick Skaggs had desperately tried to force open.

Because of the compelling evidence that likely would have been produced at a trial, this court is confident that the defendants in the Skaggs' lawsuit faced a considerable risk of liability and a large damages award against them. This conclusion is supported by reports of verdicts in similar cases, of the type that are often used as benchmarks in settlement negotiations. Of course, the Cossell Group still had the possibility of winning on its statute of limitations defense, but if that defense was not successful, its prospects were bleak. Those reports, submitted as part of the record in this case, support a conclusion that a verdict on all the Skaggs family's claims would likely have been well beyond $1.6 million, sufficient to support a discount to that figure when uncertainty over the statute of limitations defense was taken into account. See Def. Resp. Exs. 5, 6.[7] The possibility of a large jury verdict appears also to have been a significant risk in the eyes of Shelby Insurance, the insurance carrier for defendants Lloyd and Kearns. Shelby agreed to pay $300,000 to the Skaggs family in a structured settlement, even though it had filed a declaratory judgment action contesting coverage. See Def. Resp. Exs. 4, 12.

In addition to the significant risk of a large jury award against the defendants, other circumstances regarding the manner

---

7. The risk that the Cossell Group's statute of limitations defense would fail and that its principals would face a serious prospect of a multimillion dollar verdict is also consistent with this court's experience in a case with some striking parallels to this one. In *Dameron v. City of Scottsburg*, 36 F.Supp.2d 821 (S.D.Ind.1998), this court denied a motion for summary judgment, concluding that recent Indiana Court of Appeals decisions on the controlling issue would not be followed by the Supreme Court of Indiana. The case went to trial on a mother's claim for the drowning of her six year old daughter as a result of negligence on the part of city lifeguards. The proof of negligence was clear. The plaintiff's attor-

neys asked the jury in closing argument for a verdict of $3 million. In less than an hour, the jury returned a verdict of $6 million. (That verdict, however, was subject to the $300,000 damages cap in the Indiana Tort Claims Act governing claims against local governments.) After the judgment was paid, the Supreme Court of Indiana addressed the dispositive issue and overruled the Court of Appeals decisions the defendant had relied upon in its summary judgment motion. See *Benton v. City of Oakland City*, 721 N.E.2d 224 (Ind. 1999). That sequence of events reflects the risk the Cossell Group faced if it did not settle, and it did not have the benefit of a statutory cap on damages.

in which the parties reached a settlement further undermine any attempt to argue that this settlement was unreasonable or was a product of bad faith or collusion.

First, the parties to the tort lawsuit contested that lawsuit vigorously for four years, and the insureds tried twice to have the case dismissed on statute of limitations grounds. This is not a case where abandoned insureds "rolled over" by quickly conceding liability and entering into a large settlement agreement with the plaintiffs. And, as discussed above, Cossell Group did not give up an "absolute defense" when it waived the statute of limitations defense. At the time of the settlement agreement, and without the unfair benefit of hindsight provided by the Supreme Court of Indiana decision in *Schuman*, Indiana law regarding which statute of limitations governed the Skaggs' claims was uncertain.

Second, and most unusual in cases of this sort, the general partners of Cossell Group paid the Skaggs family $300,000 out of their own pockets. See Laikin Aff. ¶ 7. The cases this court has found dealing with issues of this kind involve consent judgments in which the insured pays nothing and the plaintiff agrees never to try to execute on the insured's assets. See *Sargent v. Johnson*, 551 F.2d 221, 232 (8th Cir.1977). In fact, Midwestern has not called the court's attention to, and the court is not aware of, any case finding that a consent judgment in these circumstances was unreasonable or a product of bad faith

or collusion where the insured made such a substantial cash payment to the plaintiff. That fact alone is powerful evidence that the insureds did not simply roll over on a case they were certain to win. The Seventh Circuit has often recognized that real transactions in which a client actually pays a lawyer provide a far better gauge of the market value of a lawyer's time than does a judge's attempt to divine the modern equivalent of a medieval "just price." See, e.g., *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568, 570 (7th Cir.1992). Similarly here, the fact that the principals of the Cossell Group paid $300,000 in cash provides a far more compelling measure of the reasonableness of the terms of the settlement than do the arguments of lawyers bolstered by 20/20 hindsight.[8]

Third, although the parties dispute the content of settlement negotiations, Midwestern had the opportunity to participate in settlement negotiations. This was not a settlement that was reached behind "closed doors" without any notice given to Midwestern.

Considering all the evidence discussed above that likely would have been presented if the Skaggs' lawsuit had gone to trial, the court finds as a matter of law that the terms of the consent judgment were not unreasonable and could not reasonably permit an inference of collusion or bad faith. At the time the parties reached their settlement, Indiana law on the Cossell Group's statute of limitations defense was

---

**8.** The fact that the Cossell Group paid "only" $300,000 does not show, however, that any higher amount was not reasonable. Where the insurer has breached its contract--and that is the premise upon which all of this analysis is built--the plaintiffs and defendants in the underlying lawsuit are entitled to allocate between them in a reasonable way the risks of losing the coverage dispute. This is clear from the many cases around the country enforcing consent judgments against insurers even where the insured has paid no money at all.

Courts are understandably concerned and cautious, of course, when looking at an agreement in which A and B agree that C should pay money to A. See, e.g., *Citizens Electric*

*Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016, 1022 (7th Cir.1995) (discussing Illinois law and in *dicta* describing as "contestable" the holding of *Wolf v. Maryland Cas. Co.*, 617 F.Supp. 456, 460 (S.D.Ill.1985), to the effect that an insurer will be bound by a good faith consent judgment with a covenant not to execute). As shown by the numerous decisions addressing this problem squarely, however, enforcing reasonable consent judgments is the preferable approach when insurers have breached their contracts, leaving their insureds to finance their own defenses and to face the risk of devastating personal liability. See, e.g., *Morris*, 741 P.2d at 251-52; *Miller v. Shugart*, 316 N.W.2d at 734.

not clear. Moreover, if the statute of limitations defense had turned out not to be applicable, the likely effects for the Cossell Group would have been devastating. Recall the evidence that the fire started in a faulty outlet, and especially the evidence that a Cossell Group employee had wired and chained the back door shut from the outside. Additionally, the evidence on damages made the threat of a multimillion dollar verdict a serious possibility. Such a verdict would have produced a judgment with "the sharp thrust of personal liability," see *Morris*, 741 P.2d at 251, directed against the principals of the Cossell Group. The court therefore finds as a matter of law that the settlement for $1.6 million was not so unreasonable as to permit an inference of collusion or bad faith. Because Midwestern has not produced any other evidence that the settlement agreement between the Skaggs and the Cossell Group was a product of bad faith or collusion, the court grants summary judgment to the defendants on this issue. The settlement withstands Midwestern's effort to force a trial of all the issues of liability and damages in the underlying lawsuit between the Skaggs and the Cossell Group.[9]

### C. *Midwestern's Fifth Additional Defense--"Legally Obligated to Pay"*

The defendants have also moved for summary judgment as to Midwestern's fifth additional defense that it has a duty to pay only those damages which the Cossell Group is "legally obligated to pay." This defense is based on language in the Cossell Group's 1990-91 policy with Midwestern, which states that Midwestern will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The parties assume for purposes of argument that the same terms would apply under the binder issued by the insurance agent in 1989 before the fire.

Midwestern contends it has no duty to pay the consent judgment because the agreement between the Skaggs and the Cossell Group did not impose any legal obligation on the Cossell Group to satisfy the $1.6 million judgment. As part of the agreement, after the Cossell Group paid $300,000, the Skaggs covenanted not to execute the judgment against the Cossell Group. The Cossell Group assigned to the Skaggs its claims against Midwestern. Midwestern argues that the covenant not to execute relieves the Cossell Group of any legal obligation to pay the judgment. Thus, Midwestern contends, its duty to indemnify the Cossell Group never arose and it is not required to satisfy the judgment. In response, the Cossell Group and the Skaggs contend that Midwestern should not be permitted to rely on the "legally obligated to pay" policy language because Midwestern "abandoned" the Cossell Group and failed to provide a defense to the Skaggs' claims.

The best indication of Indiana law on this issue appears in *American Family Mutual Ins. Co. v. Kivela*, 408 N.E.2d 805 (Ind.App.1980). The Indiana Court of Appeals considered the effect of a "hold harmless agreement" on an insurer's duty to satisfy a consent judgment after the insurer had refused to provide a defense for its insured. The plaintiffs and the insured settled their litigation by entry of consent judgments with the plaintiffs agreeing that the judgments would be sat-

---

9. Even if there were evidence of unreasonableness, bad faith, or collusion, it is highly doubtful that such evidence would help Midwestern avoid all liability here. The undisputed evidence shows that the Cossell Group paid the Skaggs $300,000 in cash. That amount would be reasonable under any theory here, and the Cossell Group assigned to the Skaggs their own right to seek indemnity from Midwestern for that amount. In addi-

tion, the result of a finding of unreasonableness or bad faith as to the settlement would probably be to set aside the settlement, leaving the underlying claims for trial on the merits. See *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 280 (Minn.1990) (rejecting alternatives of either letting insurer escape all liability or allowing trial court to decide on a reasonable amount of damages).

isfied only by insurance proceeds, not from the insureds' personal assets. The insurer argued that it had no duty to satisfy the consent judgments because the insureds were not "legally obligated to pay" any amount of damages. The court wrote: "At first blush, the logic of this position is enticing." 408 N.E.2d at 811. However, after reviewing the split of authority from around the nation, the Indiana court found that, having been abandoned by their insurer, the insureds were "entitled to use all reasonable means of avoiding personal liability." *Id.* at 812, quoting *Metcalf v. Hartford Accident & Indem. Co.*, 176 Neb. 468, 126 N.W.2d 471, 475 (1964). The court explained:

> It was to [the insured's] personal interest to consent to the ... judgment and accept an agreement from the plaintiff not to execute on his property other than any rights to indemnity he might have in the designated insurance policies. The matter is of no consequence to defendant if its claim of nonliability is correct. Since its claim of nonliability has no validity, and it having declined to defend the action when called upon to do so, the defendant is in no position to attack the judgment in the absence of fraud, collusion, or bad faith.

*Kivela*, 408 N.E.2d at 812, quoting *Metcalf*, 126 N.W.2d at 475-76. Thus, the Indiana court concluded "that an insurer may not hide behind the 'legally obligated to pay' language of the policy after it abandons its insured and the insured settles the claim against him by agreement." *Kivela*, 408 N.E.2d at 813.

Midwestern argues that *Kivela* is not controlling here because Midwestern filed this declaratory judgment action and therefore did not "abandon" the Cossell Group. As discussed above, Midwestern clearly had the right under Indiana law to file a declaratory judgment action and have a court determine if it has a duty to provide coverage. See, *e.g., Frankenmuth Mut. Ins. Co. v. Williams*, 690 N.E.2d at 679. Midwestern's decision to file a declaratory judgment action, however, still left the Cossell Group in a position similar to

that of the insured in *Kivela*. The Cossell Group was required to defend itself in the Skaggs' litigation, without knowing if it would have insurance coverage for the fire. Thus, like the insureds in *Kivela*, the Cossell Group was "entitled to use all reasonable means of avoiding personal liability." 408 N.E.2d at 812. The court does not believe the Supreme Court of Indiana would treat the existence of this coverage lawsuit as a reason to distinguish *Kivela*. Such reasoning would, in effect, enable an insurer, by breaching its contract, to lock its insured and injured victims into years of expensive and unwanted litigation. Under that approach, the Cossell Group and the Skaggs would have had to wait for the ultimate conclusion of this coverage litigation before reaching a settlement that would leave the Skaggs free to pursue the insurer while the Cossell Group went on about its business.

Other state courts that have considered this issue have approached it in a manner similar to that of the Indiana court in *Kivela*. These courts have focused on the insurer's refusal to defend its insured in a tort lawsuit and have prohibited the insurer from relying on "legally obligated to pay" language in their policies to avoid satisfying a consent judgment. See, *e.g., Globe Indemnity Co. v. Blomfield*, 115 Ariz. 5, 562 P.2d 1372, 1375-76 (1977) (finding that a covenant not to execute is "merely a contract and not a release" and also recognizing an "alternative theory" under which an insurer may be held liable to a tort claimant despite a covenant not to execute: "Even if there were a rule that a covenant not to execute by one party released another party whose liability was solely derivative, an exception to this rule should be recognized where the insured made the covenant in order to protect himself after being abandoned by the insurer."); *Griggs v. Bertram*, 443 A.2d at 175 ("An insured tortfeasor should be able to reach an agreement relieving it of liability when its carrier wrongfully declines to defend."); *State Farm Mutual Auto. Ins. Co. v. Paynter*, 122 Ariz. 198, 593 P.2d 948,

953 (1979) (agreeing that an insurer who refuses to defend its insured should not be able to rely on "legally obligated to pay" language in an insurance policy to relieve its obligation to satisfy a consent judgment; permitting an insurer to do so "would wholly undermine the purpose of such [consent] agreements" between insureds and tort claimants); but see *Lida Manufacturing Co., Inc. v. United States Fire Ins. Co.*, 116 N.C.App. 592, 448 S.E.2d 854, 856 (1994) ("This Court, however, along with other states, has determined that when an insurance policy contains language such as 'legally obligated to pay,' an insurer has no obligation to an injured party where the insured is protected by a covenant not to execute."); *Freeman v. Schmidt Real Estate & Ins.*, 755 F.2d 135, 138-39 (8th Cir.1985) ("An insured protected by a covenant not to execute has no compelling obligation to pay any sum to the injured party; thus, the insurance policy imposes no obligation on the insurer.") (citing cases).[10]

Midwestern relies on the Seventh Circuit's decision in *United States Fire Ins. Co. v. Lay*, 577 F.2d 421 (7th Cir.1978), to show it has no obligation to satisfy the consent judgment. *Lay* involved a dispute between a primary liability insurer and an excess liability insurer. The primary insurer had a policy limit of $100,000. It negotiated a settlement agreement with the tort claimant in which it agreed to pay only $70,000 of its $100,000 policy limit. In exchange, the claimant agreed that if there was a judgment in the tort lawsuit in excess of $100,000, the primary carrier would be "given credit" for $100,000. *Id.* at 422. The tort claimant and the primary insurer then presented an agreed judgment of $150,000, to the court and the claimant sought to recover the difference from the excess carrier.

Not surprisingly, in light of these facts, Judge Steckler of this court and a panel of the Seventh Circuit had no difficulty finding that an excess liability insurer's liability was extinguished by a settlement agreement between a tort claimant and the primary insurer for less than the amount of the primary insurer's policy limits. The Seventh Circuit found that the excess carrier was not obligated to indemnify the primary insurer because the settlement agreement "effectively released" the primary insurer from all liability in excess of $70,000. *Id.* at 423. Thus, the excess carrier's obligation to indemnify the primary carrier "never arose." *Id.*

Midwestern's reliance on *Lay* is not persuasive here. *Lay* did not involve a situation in which an insurer refused to defend its insured, forcing the insured to "protect itself" by entering into a settlement agreement with a tort claimant. Implicit in the Indiana case law on collateral estoppel discussed above is the recognition that insureds who have been forced wrongfully by their insurers to defend themselves have been placed in a very difficult position. See, *e.g., Liberty Mutual v. Metzler*, 586 N.E.2d at 902 ("An insurer, having knowledge its insured has been sued, may not close its eyes to the underlying litigation, force the insured to face the risk of that litigation without the benefit of knowing whether the insurer intends to defend or to deny coverage, and then raise policy defenses for the first time after judgment has been entered against the insured.").

Midwestern's decision to file a declaratory judgment action permits it to raise coverage defenses in this court. However, if this court were to agree with Midwestern and find that the covenant not to execute relieved Midwestern of its duty to indemnify the Cossell Group, then the settlement agreement between the Cossell Group and the Skaggs family would be worse than meaningless. See *State Farm Mutual v. Paynter*, 593 P.2d at 953 (permitting an insurer to rely on "legally obligated to

---

10. *Freeman* involved a prediction of Iowa law, but when the issue was presented to the Supreme Court of Iowa, that court disagreed with *Freeman* and held that the "legally obli-

gated to pay" theory would not relieve the insurer of liability. *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524 (Iowa 1995).

pay" language in an insurance policy to relieve its obligation to satisfy a consent judgment "would wholly undermine the purpose of such [consent] agreements" between insureds and tort claimants).

Under Midwestern's approach, an insured who has been forced by his insurer to pay for his own defense and to face huge personal liability would be in a no-win, or perhaps a "no-settlement," situation. If the covenant not to execute lets the insurer off the hook completely, the insured and the injured parties would not be able to allocate between themselves the risks created by uncertainty over insurance coverage. The injured parties would have no incentive to settle their tort claims until after the coverage issue was resolved, perhaps years later. See generally *Glenn v. Fleming,* 799 P.2d at 93 ("Settlement practices and timing have a direct effect on the quantity and flow of court business and thus on the administration of justice generally. Public policy permitting or proscribing tactical weapons developed by claimants and insurers should be shaped by two influences: (1) the public interest in encouraging settlements, and (2) fairness, that is, equalization of the contenders' strategic advantages.").

The court therefore finds that, because Midwestern is precluded from relying on the "legally obligated to pay" language in the insurance policy, the defendants are entitled to summary judgment on Midwestern's fifth affirmative defense. That does not mean, of course, that the court has determined Midwestern owes the Cossell Group any coverage here. That remains an issue for trial. But the terms of the consent judgment, which leave the Skaggs the incentive to pursue the coverage issue at this point, do not relieve Midwestern of any duties on the theory that its insureds were not legally obligated to pay the entire amount of the consent judgment.[11]

11. Even if Midwestern were correct on this issue, it would still be obligated to pay the $300,000 that its insured actually paid in cash. The Cossell Group assigned to the Skaggs all its claims and rights against Mid-

### D. *The Effect of the Skaggs' Bankruptcy*

■ Finally, Midwestern contends it cannot be liable for any amount here because the 1999 consent judgment is void as a result of the Skaggs' failure to list their claims against the Cossell Group as an asset in their 1996 bankruptcy petition. See Pl. Ex. D. The court finds that the bankruptcy trustee's and bankruptcy court's later ratification of the Skaggs' handling of the tort litigation cured the Skaggs' initial failure. Midwestern is not entitled to avoid liability on this basis.

The undisputed evidence establishes the following facts with respect to this issue. While the Skaggs' lawsuit in the Marion Superior Court was pending, Patrick and Lorrie Skaggs filed for bankruptcy in August 1996. They did not list their claims against the Cossell Group as assets on Schedule B of the petition, as they were required to do. Pl. Ex. C. However, after the consent judgment was entered in the Marion Superior Court lawsuit, the Skaggs reopened their bankruptcy in 1999, filed an amended schedule listing the various claims arising from the fire, and entered into a settlement agreement with the bankruptcy trustee. Under the agreement, the Skaggs paid $20,000 to settle all creditors' claims and costs, and the trustee assigned back to the Skaggs all his rights to and interest in the family's litigation regarding the fire. The trustee also ratified and consented to all actions that the family had taken to prosecute and settle the fire litigation, including the settlement and consent judgment. The bankruptcy court approved the settlement on December 8, 1999. Def. Resp. Ex. 2.

After a debtor files for bankruptcy, the debtor's estate includes, with exceptions not relevant here, "all legal or equitable interests of the debtor in property as of

western, and there is no apparent reason why it could not do so. The Skaggs would therefore be entitled to at least $300,000 even under Midwestern's theory.

the commencement of the case." 11 U.S.C. § 541(a)(1). This statute has uniformly been interpreted to include causes of action. See, *e.g., In re Polis,* 217 F.3d 899, 901 (7th Cir. 2000); *In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993). Midwestern argues that the Skaggs had no authority to pursue their claims regarding the fire because the bankruptcy trustee is the only party under Indiana law who could have pursued such claims. From these premises, Midwestern contends that the consent judgment is void because the Skaggs had no authority to settle their claims regarding the fire.[12]

Both sides rely on the Supreme Court of Indiana's decision in *Hammes v. Brumley,* 659 N.E.2d 1021 (Ind.1995), which actually decided several similar cases. In each, a debtor had filed for bankruptcy and had filed a tort claim against a third party without listing the tort claim as an asset on the debtor's bankruptcy petition. In each case the bankruptcy court later exercised its discretion to allow the debtor to amend the petition, and the state trial court allowed the debtor to amend the complaint to substitute the bankruptcy trustee as the real party in interest in the tort litigation. The question presented was whether the substitution of the bankruptcy trustee as the plaintiff related back to the time the debtor filed the original complaint, "notwithstanding the intervening expiration of the applicable statute of limitations." *Id.* at 1025.

The Supreme Court of Indiana held in *Hammes* that the amendments related back to the times the original complaints were filed, so that the plaintiff-debtors' failures to list their claims as assets did not effectively release tortfeasors from liability. The court reasoned that the plaintiff-debtors had all had standing to bring their claims when they were filed but were not the real parties in interest to assert such claims. The court held that the real parties in interest (the bankruptcy trustees) could be substituted and that the substitutions would relate back to the times the original complaints were filed. *Id.* at 1029-30. The court based its conclusion on sound public policy considerations. Its decision had the effect of protecting the interests of the plaintiff-debtors' innocent creditors, which is a goal of the bankruptcy law requiring claims in lawsuits to be listed as assets. The decision also had the effect of prohibiting the tortfeasors from profiting at the creditors' expense merely because the debtors had erroneously failed to list the tort claims as assets.

Similar reasoning applies here. This court sees no reason to permit Midwestern to avoid the possibility of having to indemnify an insured and satisfy the consent judgment simply because the Skaggs failed to list their pending tort claims on their bankruptcy petition. Midwestern's approach would turn upside down the goal of the bankruptcy laws. Midwestern seeks to use the debtors' failure to comply with a duty to creditors--listing all assets that may be available to creditors--as a basis for extinguishing those assets and allowing the tortfeasors or their insurer to escape liability to either the debtors or the creditors. As this court noted in its entry on plaintiff's motion to amend its complaint, "*Hammes* clearly reflects the state court's belief that these problems should be resolved in ways that serve substantive justice rather than creating new opportunities for tortfeasors to escape liability for their actions."

When the Skaggs filed their lawsuit in the Marion Superior Court, they had not filed for bankruptcy, and they obviously had standing and were the real parties in

---

12. Midwestern has not explained how the bankruptcy proceedings might have affected either Patrick and Lorrie Skaggs' claims as next friends of their children Patricia Skaggs and the late Amber Nicole Mitchell, or the Cossell Group's claims against Midwestern for defense costs, which the Cossell Group has assigned to the Skaggs. However, because the court finds that the steps taken to reopen the bankruptcy proceedings are sufficient to allow Patrick and Lorrie Skaggs to pursue even their own claims, the court need not resolve these other issues.

interest to pursue their claims. Under *Hammes,* after the Skaggs filed for bankruptcy, they still had standing to pursue their lawsuit for damages arising out of the fire, but the bankruptcy filing meant that the trustee then became the real party in interest who should pursue at least some of those claims.[13] The Skaggs later took sufficient steps to cure the problems created by their incomplete bankruptcy filing by petitioning to reopen their case, filing an amended schedule listing the claims arising from the fire, and entering into a settlement agreement with the bankruptcy trustee that was approved by the bankruptcy court. Def. Resp. Ex. 2.

Under *Hammes,* these undisputed facts show that the Skaggs' failure to list their tort lawsuit in their bankruptcy petition did not render the consent judgment in the tort lawsuit void under Indiana law. Summary judgment for Midwestern on this basis is therefore denied. Defendants have not moved for summary judgment on this defense, but it appears that they may be entitled to it. Midwestern shall show cause no later than September 15, 2000, why summary judgment should not be entered for defendants on the issue whether the Skaggs' failure to list the tort claims in their bankruptcy petition voids the consent judgment. Any response shall include any additional evidence Midwestern relies upon to avoid summary judgment on this issue. Defendants may reply to Midwestern's response within 30 days after it is filed.

### Conclusion

For the foregoing reasons, the court denies Midwestern's motion for summary judgment and orders Midwestern to show cause within 30 days why the court should not grant summary judgment to the Cossell Group and find as a matter of law that the Skaggs' failure to list their claims against the Cossell Group on their bankruptcy petition does not render the consent judgment void. The court grants summary judgment to the defendants on Midwestern's fourth additional defense because there is no evidence that the settlement agreement between the Skaggs family and the Cossell Group was unreasonable or a product of bad faith or collusion. Additionally, the court grants summary judgment to defendants on Midwestern's fifth additional defense because Midwestern is precluded from relying on the "legally obligated to pay" language in the insurance policy. The court will confer with counsel on Tuesday, September 5, 2000, at 4:30 p.m. in Room 330, U.S. Courthouse, Indianapolis, Indiana, to set a date for trial on the issue of coverage.

So ordered.

---

**13.** Again, the court is ignoring the complication posed by the fact that Patrick and Lorrie Skaggs were also pursuing claims on behalf of the two children who were victims of the fire, whose claims presumably would not have been part of the parents' bankruptcy estate.